## T. J. PEARSON v. THE STATE.

No. 4032.    Decided June 23, 1909.

**1.—Murder—Continuance—First Application.**

Where upon trial for murder defendant's first application for continuance showed proper diligence, and that the testimony of the absent witness was material, the same should have been granted.

**2.—Same—Evidence—Attorney and Client—Threats—Privileged Communication.**

Where upon trial for murder defendant's attorney was introduced by the State to prove qualified threats against the deceased, the same was not a privileged communication between attorney and client, and was admissible.

**3.—Same—Evidence—Expert Testimony.**

Upon trial for murder it was reversible error to permit a physician to give his opinion as to whether the hand of the deceased could have been so placed or held as to have received the wound on the thumb at the same time the shot struck the wrist. This was not within line of expert testimony, but it related to the position of the parties during the difficulty. Following Williams v. State, 30 Texas Crim. App., 429, and other cases.

4.—Same—Evidence—Declarations of Third Party—Impeachment.

Upon trial for murder there was no error in admitting in evidence the declarations of a third party to the effect that he told defendants daughter to stand up for her father and not tell anything against him; for the purpose of attacking the credibility of said party as a witness, the same being properly limited thereto.   Davidson, Presiding Judge, dissenting.

Appeal from the District Court of Palo Pinto.   Tried below before the Hon. W. J. Oxford.

Appeal from a conviction of murder in the first degree; penalty, life imprisonment in the penitentiary.

The opinion states the case.

*Crawford & Lamar* and *Stevenson & Brown,* for appellant.—On question of continuance:   Dyer v. State, 83 S. W. Rep., 192; Richardson v. State, 28 Texas Crim. App., 216; Beard v. State, 55 Texas Crim. Rep., 154, 115 S. W. Rep., 592; Carter v. State, 37 Texas Crim. Rep., 403; Yantis v. State, 49 Texas Crim. Rep., 400, 94 S. W. Rep., 1019; Casey v. State, 51 Texas Crim. Rep., 433, 102 S. W. Rep., 725.   On question of attorney and client:   Graham v. State, 43 Texas Crim. Rep., 110.   On question of expert testimony:   Cases cited in the opinion.

*F. J. McCord,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was given a life term in the penitentiary on a charge of murdering W. E. McConnell.

The record contains 427 pages independent of the statement of facts, and it required 421 pages of typewritten matter to cover the evidence adduced on the trial.   The evidence chronicles one of the saddest stories and tragedies of human life.   The deceased was a practicing attorney at Mineral Wells, where the homicide occurred. Appellant was at the head of a family consisting of his wife and several children, some of the children grown.   Their domestic relations were and had been for a long time of a very unpleasant character.   His wife, for various reasons, had ceased to live with him and had engendered in her mind a spirit of aversion, if not hatred, towards him growing out of their domestic troubles.   She had become jealous, and this jealousy had matured into very unkind feelings. They lived separate, though in the same town, the wife occupying the homestead with those of the children, who remained in Mineral Wells. Appellant accumulated quite a competency, which he had divided with his wife under an agreement.   Under this agreement he had given her about $12,000 worth of property, retaining something less, his being incumbered by all the debts, amounting to about $3,000.   At the time of their separation, at least at the time of the mentioned agreement, the division of the property seemed to be entirely satisfactory to the wife.   It was claimed by appellant that deceased had

induced his, appellant's, wife to believe that he had mistreated her in the settlement and had gained vastly the advantage in the division of the property. It is further claimed that deceased had about induced Mrs. Pearson to bring suit for divorce and ask for an annulment of their previous settlement between herself and husband with the further purpose of placing the entire property in the courts and in the hands of a receiver. That deceased had gone sufficiently far to advise Mrs. Pearson that she would be justifiable in taking the life of appellant and that he, deceased, would see that she was acquitted. There is evidence of this character in the record. On the morning of the fatal meeting between appellant and deceased, appellant had gone to their homestead, which was occupied by his wife, in order to induce her not to bring the suit and fritter away the property in litigation and with the further view of another agreement with her to the effect, in substance, that they would make an arrangement by which the property could be used for herself and children, and especially the children, and that he would relinquish all right, title and interest to the entire property and leave the country and go away and begin life anew. His wife was very discourteous upon his arrival at the house, and phoned for the deceased, who had advised her under no circumstances to talk about the management of her property and matters connected with it, except to or with himself. Deceased was not in the office at the time of the phone call, but his partner, or a young lawyer in the office, replied and was in the act of starting to the Pearson homestead when the deceased entered his office and answered the call by going to Pearson's homestead. Upon arriving at the house, deceased was escorted into the parlor. After deceased had entered the parlor appellant also entered it and almost instantly the shooting occurred, resulting in the death of the deceased at once. As is usual, the immediate incidents connected with the homicide are presented from very different standpoints. The State insists it was an unjustifiable killing. Appellant that the shooting was in self-defense and not above the degree of manslaughter. The evidence took a very wide range, and was gone into with great prolixity. The record contains 92 bills of exceptions of various lengths.

1. The first bill of exceptions complains of the ruling of the court in refusing a continuance for the testimony of absent witnesses, among whom were appellant's wife and a Mr. Harris. The bill is qualified by the trial judge in which he takes a wide range of statement of reasons, things and matters that seem to be dehors the record and which seem to have been known to him or in some way called to his attention. This was appellant's first application for a continuance. We are of opinion the diligence was sufficient as to the wife. It is shown that after the homicide she left the State. The judge seems to have had the idea, as stated in his qualification of the

bill, that Mrs. Pearson was spirited out of the country by her husband, at least that ¹ e was in some way responsible for her absence, and was, therefore, not entitled to a continuance on this ground of the application. We do not believe this record sufficiently suggests that theory or sustains that conclusion; at least, the evidence in this connection is entirely too slight. It is true that they were husband and wife. They had not been living together. Her feelings up to the very moment of the death of the deceased had been very bitter towards appellant—acutely, incisively bitter. Things had been said, or at least the record shows that she had been informed of statements that appellant made that reflected upon her or were calculated to imbitter, and these statements were conveyed to her by the deceased. These matters were partially proved by the witnesses and there were intimations of others drawn out in the investigation of the case, but this was the first application for continuance, and even if the testimony adduced upon the trial should be held to be cumulative of her testimony, or her testimony cumulative of that adduced, still this would not furnish a reason for refusing the first application. The court suggests there may have been a reconciliation between appellant and his wife after the death of deceased. This may or not have been partially true, but it is far from clear under this record, that she left the country with his knowledge and, of course, with his consent. She went to some point in the State of Oklahoma. He sought her testimony at that point or information as to where he could get her testimony, and finally discovered the fact that she had gone to New York or New Jersey. He was unable to locate her point of residence in time to secure her testimony, if in fact he located it at all up to the time of the trial.

In support of his diligence appellant appends the affidavit of his daughter, to the effect that her mother left the country without the knowledge or consent of the appellant and the mother implored secrecy on the part of the daughter until she had gotten out of the country so that the father would not be aware of her leaving until after she was gone. In support of this, the appellant further offered evidence to the effect that he knew nothing of her intended absence and this was rejected by the court. This is important in view of the qualification placed on the bill by the court which was substantially that the parties had been reconciled and that she had been induced to leave the country, or at least required to do so, by her husband. These are but conclusions of the judge and in the face of the views already expressed, we are of opinion that the diligence was sufficient and the continuance should have been granted on account of the wife's absence. Her testimony, without repeating it, was of a very material character. Beyond any question, it would have been the most material testimony had she been present that could have been adduced upon the trial. It would have shed more light upon the trouble and causes of the trouble between herself and

husband, and what it was that aroused her to the point of separation and the insistence of having a readjustment of their property rights, than could have been secured from any other source. As before stated, we deem it unnecessary to repeat all of the testimony set out in the application. It is sufficient to state that it was of the most material character.

2. The testimony of Lassiter, an attorney, was introduced over appellant's objection. Lassiter occupied the relation of attorney to appellant. The judge, qualifying the bill, states that he was not clear in regard to the matter, but let the testimony go before the jury. As the bill presents the matter, we are of opinion that this testimony was admissible. Not the confidential communication between them with reference to business matters, but during a conversation appellant remarked in substance that if deceased was a wise man he would not do certain things, that is, in respect to bringing the suit for divorce, etc. This may be treated in the nature of qualified threats and therefore could not be the subject of privileged communications between attorney and client.

3. Dr. McCracken was permitted to give his opinion in regard to certain phases of the wounds found upon the body of the deceased. It seems that deceased was shot in the wrist or hand during the difficulty, and that the thumb was also struck by one of the balls. The witness was asked to state whether the hand could be so placed or held as to have received the wound on the thumb at the same time the shot struck the wrist. He answered, "I saw there the wound was in the back of the hand and where it came out." He was then asked to state whether or not in the ordinary way in which the hand and thumb can be doubled, the hand could be held in such a position as taking in view the point of entrance and the point of exit, at the wrist or back of the hand, the ball could have come in touch with the ball of the thumb. Various objections were urged and the witness answered: "I think it was very questionable whether a ball in the wrist here could affect the thumb in any way." Under all the authorities this character of testimony, we think, is not admissible. The relation of these wounds seem to have been thought of some value to the State in meeting appellant's view of the case as to how the shooting occurred. The State's contention was that deceased was sitting in a rocking chair at the time he was shot, and did not arise from it. Appellant's theory was directly the reverse, and to the effect that when he entered the room and accosted the deceased and asked him about the statements he had been making to his wife, deceased rose and undertook to make an attack upon him, and for this reason he fired. We do not believe it is within the line of expert testimony to undertake to settle questions of this sort by opinion. The position of parties with reference to each other during a difficulty can not be settled by opinion evidence, whether it is from doctors or others. A doctor could not possibly have any conception

of the particular position in which the hand of deceased was at the time the shot or shots were fired, nor the position in which the thumb was placed at the time with relation to the remainder of the hand.    There are many ways in which the hand and the fingers might relate to each other, owing to the whim or caprice of the party who is manipulating his own hand.    As authority for the opinion here expressed see Williams v. State, 30 Texas Crim. App., 429; Thompson v. State, 30 Texas Crim. App., 325; Caveness v. State, 45 Texas Crim. Rep., 209, 74 S. W. Rep., 908; Funderburk v. State, 64 S. W. Rep., 1059; Blain v. State, 33 Texas Crim. Rep., 236. These cases are sufficient without reference to others.

4.    While the witness White was upon the stand he was asked by the State the following question:    "You are the man that went around to Mr. Pearson's daughter just after the killing and told her not to tell anything on him, didn't you?"    Many objections were urged to this question and its answer.    Among others, that an act or declaration on the part of the witness after the difficulty could not be introduced against appellant when it did not occur in his presence, and could not be used to prejudice the case in the minds of the jury.    The witness was forced to answer, which he did as follows:    "I did talk to Mr. Pearson's daughter.    I do not remember exactly what it was I said to her, but in substance I told her to stand up for her father and not to tell anything against him."    The theory of the court was that this evidence was admissible as affecting the credibility of White.    The majority of this court entertains the opinion that this ruling of the court was correct; that the State could use this testimony as bearing upon the credibility of White, to be limited, of course, solely for this purpose.    The writer, however, entertains a different view and is of opinion that it was inadmissible and was of a most damaging character and might have been used by the jury against appellant in that one of his witnesses was placed in the attitude of suppressing testimony, or rather inducing the daughter of appellant not to tell anything against her father on the trial.    The writer is of opinion that this character of testimony is not legitimate even for the purpose of impeaching the witness White, or as affecting his credibility, as here presented.    The fact that White may have undertaken to suppress testimony or to prevent its being brought out upon the trial, would not be any fact against appellant, unless it was with the knowledge and assent of appellant, and in the writer's view of the matter, it would be immaterial whether it was sought as original or as impeaching testimony.    See Nalley v. State, 28 Texas Crim. App., 387; Favors v. State, 20 Texas Crim. App., 155; Marshall v. State, 5 Texas Crim. App., 273; Barbee v. State, 23 Texas Crim. App., 199; Luttrell v. State, 40 Texas Crim. Rep., 651; Maines v. State, 23 Texas Crim. App., 568; Newton v. State, 41 Texas Crim. Rep., 610, 56 S. W. Rep., 64; Gann v. State, 57 S. W. Rep., 668; Cogdell v. State, 43

Texas Crim. Rep., 178, 63 S. W. Rep., 645; Campbell v. State, 30 Texas Crim. App., 645.

There are many other questions in the case urged for consideration, but the bills of exception are not very clear or definite and the discussion of these matters is pretermitted. The bills are voluminously qualified by the trial judge which leaves the matters therein mentioned in a very confused and confusing condition.

For the reasons indicated the judgment is reversed and the cause remanded.

*Reversed and remanded.*