OSVEL JOHNSON V. THE STATE.

No. 20900. Delivered April 10, 1940.
Rehearing Denied May 15, 1940.

The opinion states the case.

*Vernis Fulmer* and *Russell & Edwards,* all of Nacogdoches, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

GRAVES, Judge.

Appellant was convicted of the murder with malice of Eugene Eddings, and by the jury sentenced to serve twelve years in the penitentiary.

The facts show that on the night of the fatal difficulty appellant, his brother Otis Johnson and the deceased, among others, attended a dance at the residence of a Mr. Rodgers. That sometime during the dance appellant's brother Otis and the deceased engaged in an argument, the details of which are not clearly shown by the testimony. This argument culminated in a fist fight between Otis Johnson and the deceased, in which

fight appellant's brother Otis seemed to get the best of it, finally getting the deceased down with Otis Johnson on top of him, beating him. Finally the deceased got out from under Otis Johnson and started away rapidly, at which time appellant appeared on the scene with a knife in his hand—some of the witnesses called it a Jack knife with a blade some three or four inches long—and appellant inquired: "Where did the s—of—a—b— go?" Appellant then went down the road in the direction of the deceased, and struck the deceased, there being nine knife wounds on the deceased's body. Appellant then came back towards the house with his knife bloody, and made the statement that "if the man is hurt very bad I guess I did it." From these nine knife wounds, some very serious and large, the deceased died in a very short time, before he could be brought to a doctor.

Bill of exceptions No. 1 relates to an objection to Sheriff Cook testifying to the wounds on the body of the deceased, and as to the apparent depth of the same, and as to what looked like the point of entry into the body and the direction of the cut. It is true that the witness did testify that it looked like the knife entered at a certain point and was jerked back, but he also said in such statement: "In other words, the cut was shallower as it came back towards the back." We think this was merely a description of the wounds in a manner of a shorthand rendition of facts in describing these wounds. That appellant made these wounds his own witnesses showed, and the sheriff was merely trying to show what kind of wounds they were. It does not take an expert to tell what a wound looks like from the outside. Other witnesses testified that they could put four fingers in some of the cuts on the deceased's body. We do not think such testimony came within the realm of expert testimony.

Bill of exceptions No. 2 complains of the introduction in evidence of certain articles taken from the deceased's body after death, which consisted of a chauffeur's button, and his shirt and pair of trousers. These articles were covered with blood, and were objected to as prejudicial and inflammatory, there being no question as to the nature of the wounds nor identification. The careful trial judge qualified this bill by the statement that such articles were not introduced until after the appellant had introduced in evidence a bloody knife taken from the trousers pocket of the deceased after his death. The bloody knife was introduced in order to corroborate the statement of appellant's wife Myrtle, who testified that she saw the deceased "make a jerk for his knife." The knife of appellant

was also produced, and it was covered with blood. The State's theory was that the knife which was in deceased's pocket, received its blood from the clothes of deceased, which were saturated with deceased's blood. It is worthy of note also that no wounds of any kind were shown by the testimony to have been on the body of either appellant of his brother Otis. We see no error reflected in this bill, nor in bill No. 3, which is based upon the statement of a witness that the deceased person's clothing were saturated with blood.

Bill of exceptions No. 4 is based upon the following occurrence:

"FULMER (Attorney for defendant.)—At this time we wish to exhibit the defendant here to the jury so they can see his eyes. We exhibit his eyes to the jury with his glasses removed.

"MUSSELWHITE (Attorney for the State.)—We object to that unless he is going to testify.

"FULMER—We object to them suggesting anything like that. Go back and set down, Mr. Johnson.

"MUSSELWHITE—We would like to have the privilege of cross examining the witness at this time, and ask him to take the witness stand and testify; he has been tendered as a witness.

"FULMER—We object to such remarks as that by counsel in the presence and hearing of the jury, because it is highly inflammatory and prejudicial to the rights of the defendant, under the Constitution and laws of the land, and we ask the jury to be instructed not to consider such request, either directly or indirectly.

"MUSSELWHITE—We insist upon our right to cross examine the witness.

"COURT—The objection is overruled.

"MUSSELWHITE—We are not objecting; we are insisting on our right to cross examine the witness.

"COURT—If you want to examine him physically—.

"FULMER—We do not object to him examining him physically.

"MUSSELWHITE—We take the position that he has been tendered as a witness and we have the right to examine him."

It will be noted from the above that the only objection leveled at this occurrence is that the remarks by State's counsel were highly inflammatory and prejudicial to the rights of the defendant under the Constitution and laws of the land.

We note from a reading of the evidence offered that appellant attempted to present his defense through his wife and to prove by her that he was being attacked by the deceased at the time

he killed him, and that the wife said: "Watch him, Slim (appellant), he has a knife." It is true that the State offered testimony to the effect that her statement was "Somebody catch Slim, he has his knife open," the wife at that time having gone with appellant into the yard where Otis and the deceased were fighting. The defense offered through the wife seems to be that appellant "was blind in one eye and could see but little out of the other one," and she was warning him relative to what the deceased's actions were at the time or just before the fatal difficulty. Such a defense would undoubtedly be assisted by a proof of appellant's near blind condition, and for the purpose of demonstrating such condition his eyes were offered before the jury as an exhibit and as evidence to be seen through the jury's own eyes relative to his near blindness. This is what the writers on evidence call auto-optic evidence. Mr. Webster, in defining evidence, gives a quotation from Greenleaf as follows: It is "that which is legally submitted to a competent tribunal as a means of ascertaining the truth of any alleged matter of fact under investigation before it."

The only objection that could be leveled at the statement of the State's attorney when he insisted upon his right to cross-examine the appellant, so it seems to us,—and the one appellant's attorney intended,—was that such was an allusion to the defendant's failure to testify. We do note, however, that the trial had not been concluded at such time, and it could not be known whether the defendant intended to take the witness stand and testify or not. Of course the State did not have the power to compel the defendant to testify, nor should it have called him to the stand, but when the appellant's attorney offered him as an exhibit before the jury, and attempted to, and did, cause the jury to see with their own eyes appellant's defective eyesight, we think the request of the State's attorney to be allowed to cross-examine him relative to his proffered evidence was indicative of his belief that he though the same did not infringe upon the rule above referred to. It will be noted, however, that the trial court did not allow any cross-examination upon the part of the State. We quote from Bosley v. State, 69 Texas Crim. Rep. 100, 153 S. W. 878: "While Edwin Booth was testifying in behalf of defendant, the defendant attempted to prove by him a self-serving declaration made by defendant to this witness after his arrest. State's counsel objected, and in stating his objection said it was hearsay and self-serving, and if they wanted to prove that fact let them place defendant on the stand. Defendant objected to the latter

part of the remark of counsel for the State, which objection was sustained by the court. This was during the trial of the case, and at this time it could not have been known whether or not defendant would testify in the case, but appellant now contends that this identical remark of the district attorney was a reference to defendant's failure to testify, and for which cause this case should be reversed. Appellant was seeking to elicit from the witness what the defendant had said in his own behalf on a certain occasion, and if this objection made by counsel for the State should be held to be a reference to defendant's failure to testify, incidentally made, this court has held in Combs v. State, 55 Texas Crim. Rep. 332: 'that any bare allusion by the prosecuting attorney to the failure of the defendant to testify would not operate a reversal of the case.' See also Cabrera v. State, 56 Texas Crim. Rep. 141; Johnson v. State, 53 Texas Crim. Rep. 339; Smith v. State, 52 Texas Crim. Rep. 344, and Am. & Eng. Ency. of Prac., Vol. 5, p. 339, where a long list of authorities will be found from this and other states so holding."

In the case of Martin Gatlin v. State, 72 Texas Crim. Rep. 516, 163 S. W. 428, this court said:

"When the witness asked him (the district attorney) if he would let him tell what Martin (the appellant) had said, the district attorney, replied, no, Martin is here and he can tell himself—it would be hearsay. The fact that Martin was there was known to every juryman, he had to be there during the trial. That furnished the jury no information, and we think every intelligent man now knows that a person on trial can testify if he so desires. At the time this remark was made the district attorney could not and did not know whether or not Martin Gatlin (defendant) would testify. It was an incident of the trial, and not intended and could not be construed by the jury as criticising or commenting upon the failure of the defendant to testify. It is true that the statute, article 790, provides that the failure of a defendant to testify shall not be alluded to nor commented on by counsel, but can this be said to be a comment on his failure to testify. Of course, it is better that such remarks should not be made, but where they are incidentally made, as in this instance, does this present ground for reversal, when the court subsequently instructs them that they must not take his failure to testify as a circumstance against him, there being no contention that the jury did consider the matter, or it was ever thereafter even remotely referred to, when it subsequently developed that defendant did

not intend to testify in the case. This court has frequently stated the rule to be that a reversal should not be had for the mere incidental mention of appellant's failure to testify, but that before a new trial should be granted, it must reasonably appear that the language used or reference must be such that it might probably have prejudiced the defendant's cause. Johnson v. State, 53 Texas Crim. Rep. 339; Smith v. State, 52 Texas Crim. Rep. 344."

To the same effect is the court's holding in the late case of Connors v. State, 111 S. W. (2d) 716.

We are of the opinion that no error is shown herein and the judgment is affirmed.

### ON MOTION FOR REHEARING.

KRUEGER, Judge.

Appellant, in his motion for rehearing, reiterates the same legal propositions which he urged in the original submission for a reversal of the judgment. These have all been fully discussed by us in our original opinion. However, we have again reviewed the alleged errors with much care but see no reason for receding from our original position.

Appellant vigorously asserts that we erred in disposing of his Bill of Exception No. 1 in which he complains of the description of the wounds as related by the sheriff. The sheriff merely described the location of the wounds on the body of the deceased and the length and depth thereof. This he could do inasmuch as he had observed them. He certainly could tell whether the woulds were deep or shallow. He did not undertake to testify as to the relative position of the combatants from the location of the wounds. Consequently, the facts of this case do not bring it within the rule announced by this court in the case of Pearson v. State, 120 S. W. 1004, and Maroney v. State, 29 S. W. (2d) 772.

We do not deem it necessary to again discuss the other claimed errors, as it would serve no useful purpose. They were, in our opinion, correctly disposed of in the original opinion.

The motion for rehearing is overruled.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.