### G. L. LEWIS v. STATE.

No. 24957. January 10, 1951.
Rehearing Denied March 21, 1951.

*Saner, Jack & Sallinger,* Dallas, and *Martin, Moore, Brewster & Dean,* Fort Worth, for appellant.

*Will R. Wilson, Jr.,* Criminal District Attorney, *Charles S. Potts and Hugh W. Lyerly,* Assistants District Attorney, Dallas, and *George P. Blackburn,* State's Attorney, Austin, for the state.

WOODLEY, Judge.

Appellant was convicted for the offense of keeping, for the purpose of gaming, a gaming table and bank. The jury rejected his plea for suspension of sentence, and assessed his punishment at two years' confinement in the penitentiary.

The indictment alleged the offense to have been committed on or about June 26, 1949.

At the time the appellant went to trial, he also at that time stood charged by two other indictments with keeping and exhibiting a gaming table and bank, the same offenses as were contained originally in the indictment herein, such offenses being alleged to have occurred on June 11, 1949, and June 18, 1949.

At the time of the trial five other persons stood charged in separate indictments—three against each of them—as co-defendants, with the same offenses in each indictment and on the same dates as alleged in the three indictments against appellant, such persons being Frank Otis Hoffman, Willis G. Richards, Edward N. Simone, Thomas Cooley and Raymond McCarty; and J. C. Cheek stood charged as a co-defendant in separate indictments for the same alleged offenses on date of June 11, 1949, and June 18, 1949.

Maurice Lehman was charged by indictment with knowingly permitting property or premises of which he was the owner, and which was under his control (which the testimony showed to be the place known as the Suburban Club), to be used as a place to bet, wager and gamble with cards and dice, and as a place to keep or exhibit, for the purpose of gaming, a gaming table and bank.

The building in which such Suburban Club was located had a ground floor which was occupied and used as a cafe and res-

taurant. There was a stairway in the back of the building, which stairway contained some 12 or 14 steps and was some 12 or 14 feet in length, connecting the ground floor with the second floor of such building. On the second floor of the building there was a room containing one of the offices of the business known as the Suburban Club and another room, referred to in the record as the gaming room, where were located several tables where persons could be served with food and drinks and upon which card games could be played, a billiard table and billiard cues and balls. There was a door about midway of such stairway.

The top panel of this three panel wooden door was made of glass of a variety called "one-way" glass. One looking through this glass panel from the landing and stairway above was able to see through the glass and observe those approaching from below, while he could not be seen from the opposite side of the door.

The evidence shows that on June 26, 1949, officers raided the place in Dallas known as the Suburban Club.

On June 11, 1949, J. E. Pennington and George C. Arnett, police officers of the city of Dallas, in plain clothes, visited the Suburban Club.

The two officers went up the stairway and entered the gaming room. The door on the stairway was open when they came up the stairs. Appellant was among the six or seven people in the gaming room. He was seated at a table near the door of the room drinking coffee. Two men were playing billiards.

Frank Hoffman, one of the men in the room, asked the officers if they would like to shoot craps, and they said they would.

The billiard balls and cues were removed from this table, and dice, money and a stick, referred to by the witness as a "dice stick" were provided.

The billiard table was arranged for a dice table by the use of playing cards arranged chronologically, fours to nines (except for the number sevens) and with a ten on the side.

A dice game proceeded, Simone, Richards, Cheek, Cooley and McCarty acting as "banker" "bet taker" and "stick man," and each of the several players in the game, including the offi-

cers, making their bets ranging from $5.00 to $50.00 against these bet takers, who called all bets with money they had in their hands for the purpose. Neither of the named operators threw the dice at any time.

Appellant left the gaming room but the officer Pennington, who testified, said that he did not know when he left.

The officers, in leaving, went down the stairs where they found appellant on the up side of the door at the landing. The door was locked, and appellant unlocked it, invited the officers to return and closed and locked the door after they passed through it.

On June 18, 1949, the same officers again visited the club. They were admitted through the glass-paneled door by appellant, who opened the locked door in response to their tapping.

In reply to their inquiry, appellant told the officers that a game was in progress. Appellant after admitting the officers remained at the door.

It was shown that from his position at this door, appellant was unable to see into the room where the dice game was in progress.

The officers on this occasion again participated as players with others in a dice game banked by the same persons jointly, in the same manner as on the previous occasion.

On the night of June 25, and just prior to midnight, these officers made their third visit to the club. They again found the glass-paneled door closed and locked, and again it was appellant who opened the door for them, and remained at the door.

Upon entering the gaming room they again found a dice game in progress, the same group jointly operating the game as bankers.

Some 25 or 30 minutes after these two officers in plain clothes arrived, and while they were engaged as participants in the dice game, other officers arrived at the club for the purpose of carrying out their plan of searching the place and arresting the parties engaged in keeping the gaming table or bank.

From the time of the arrival of these officers, the state was able to show by witnesses what transpired on both sides of the locked and guarded door with the one-way glass lookout panel.

Officer Pennington testified from his viewpoint in the gaming room as follows:

"At 12:19 on the morning of June 26th, according to my watch, the dice game was interrupted by a buzzer sounding in the room. As soon as the buzzer sounded, Willis Richards, who was acting as the man with the stick, yelled 'Clean it up,' and he ran over and threw the stick onto the neon tubing which ran around the entire room, at the top, and about this time, G. L. Lewis (appellant) ran through the door and told everyone to take a seat and act like they were playing cards. Lewis (appellant) was the man who had admitted us to the locked door into the room and he had not been up there in the room prior to the time the buzzer sounded. Simone grabbed all of the money up and put it in a cigar box along with the blank check on which he had loaned people money; he had put down the amount he had loaned them, and stuffed it all into his pocket, then he—in the meantime Lewis (appellant) had grabbed some of the cue sticks and billiard balls and threw them on the table, and then Simone gave Lewis (appellant) an empty box, and he threw it over on one of the side tables; Simone put the money in his pockets, I believe in several pockets, if he put any in his billfold I didn't personally observe it; he was in quite a hurry; Lewis (appellant) took the cigar box and ran over across the room, and seemed to be searching for a place to put it, and then he threw it on one of the little tables; everyone got away from the billiard table and sat down in what chairs they could find and some decks of cards were thrown out and they began to play gin rummy, and similar games, and Lewis (appellant) picked up a cue stick and knocked a billiard ball around; the cue stick did not have a tip on it; Lewis (appellant) was the only one that I personally remember being at the billiard table."

Other officers of the city of Dallas, who searched the premises under authority of a search warrant, described the activities as seen from the outside of the door and following their entry into the gaming room.

Deputy Chief of Police Harry T. Riddell testified in part:

"* * * on the early morning hours of June 26, 1949, I had

occasion to go out to the Suburban Club, located at 3118 Oak Lawn Avenue, in Dallas, Dallas County, Texas, in company with Captain Cantrell and other members of the police department; immediately upon going in we served a search warrant on Maurice Lehman; about four or five minutes after we got in we went on to the upstairs room at the back on the second floor level; the other officers had already preceded me up there; I saw defendant, G. L. Lewis, Edward Simone, Raymond Mc-Carty, Willis Richards, Frank Hoffman, Thomas Cooley and some other people in the room; I was standing right by Captain Cantrell when he talked to Edward Simone; I would say that Simone was nervous and excited and flustered; I heard the conversation and Captain Cantrell said to Simone "I want the bankroll from this game" and Simone said 'If that is what you want, here it is,' and handed him a roll of bills; when I saw them the bills were loose in his hands and were not in a billfold; Captain Cantrell asked him if that was all of it and he said that it was; he then walked over to me and said 'This is a helluva hard way to make a living, isn't it?' "

Lt. D. D. Henderson testified in part:

"We went through the first floor of the Club to the back end to the door, knocked and it didn't open; and we could hear a buzzer going, a buzzing noise, and it was going when we got to the back door there. The upper panel of the door was made of glass, and when we knocked on the door and couldn't get no response and it was locked, we knocked out the glass and reached in and unlocked the door and went on upstairs then to the room on the second floor level and went in that room. There was about fifteen to twenty people milling around but I didn't count them. The defendant G. L. Lewis was in that room; the people all acted like they were trying to get located; some were walking around the room, some sitting down, some trying to play pool and had cue sticks up there and two or three balls on the table; I believe Mr. Lewis (appellant) had a cue stick in his hand, but it was unusual for a cue stick because it didn't have a tip on it."

Captain A. C. Cantrell testified in part:

"We had to go from the front of the Suburban Club all the way back through the first floor level to get to the door going upstairs; there were about three or four steps, a landing, and then a door that goes up into the upstairs room; this door was closed and locked that evening; we took a piece of bar and broke this glass out and reached through and unlocked the door

and went on up to the upstairs room; the glass was one-way glass where you can see out from upstairs but can't see in from the landing; after we unlocked the door we went on up and walked into the room where approximately eighteen or twenty people were congregated; the defendant, G. L. Lewis, Thomas Cooley, Willis C. Richards, Raymond McCarty and Edward Simone were all in that room; the defendant was shooting pool on the billiard table, some of them were playing cards and some were drinking.

"We heard a buzzer for the first time just about when we got the glass broke out of the door and we continued to hear that noise when we entered the upstairs room; we later traced the noise and found a buzzer, Lieutenant Henderson traced it."

Many exceptions were reserved to the overruling of objections to the court's charge, and there are twenty-four bills of exception shown in the record. All of these matters have been given consideration, but only those urged by argument and brief will be discussed, the remaining contentions being overruled as showing no reversible error.

In paragraph 10 of his charge, the trial court gave the following instruction to the jury:

"You are instructed that if there is evidence before you as to any acts or declarations made or said by Edward Simone, Frank Otis Hoffman, Raymond McCarty, Willis Richards, J. C. Cheek and Thomas Cooley, or any or all of them, made or done outside of the presence of the Defendant, G. L. Lewis, you are instructed that you cannot consider any such acts or declarations, if any, of any of said persons above named unless you find and believe from the evidence, beyond a reasonable doubt, that at the time any such act or acts, or declaration or declarations were done or made, if any, there existed a conspiracy between such person or persons making such declaration or declarations or doing such act or acts if any and the Defendant, G. L. Lewis, to keep a gaming table or bank for the purpose of gaming, and unless you find and believe from the evidence beyond a reasonable doubt that such conspiracy existed between the Defendant and such other person or persons, then and in that event, you will disregard any such act or acts, or declaration or declarations, if any, made by any of such persons outside the presence of the Defendant, if any."

Appellant objected to such charge because the court therein required the jury to pass upon the question of whether or not

there was evidence of facts, conduct and declarations of the co-conspirators outside of the presence of appellant, whereas appellant contends that the uncontradicted testimony shows that such acts, conduct and declarations were shown to be outside of the presence of appellant. It was therefore appellant's contention that the charge given was upon the weight of the evidence, and that the court should have instructed the jury that they could not consider such acts, declarations and conduct out of the presence of appellant, unless they found beyond a reasonable doubt that a conspiracy existed between such persons and appellant.

Appellant urges that he was not present in the gaming room, and that what was said and done there was not "in his presence." He calls attention to the testimony of several witnesses to the effect that the person located at the door on the stairway could not see what was being done in the gaming room.

Under the law of principals (Arts. 66-69, P.C.) which was charged upon by the court, to be present at the commission of an offense, the presence need not be actual immediate presence such as would make one an eye and ear witness of what passes, but may be a constructive presence, such as being in view or immediately at hand. See Branch's P.C., p. 347, Sec. 680; Hill v. State, 135 Tex. Cr. R. 567, 121 S.W. 2d 996; White v. State, 154 Tex. Cr. R. 489; 228 S.W. 2d 165, 170.

We are unable to agree that the undisputed evidence shows that appellant was not present at the time of the acts, declarations and conduct of the operators of the dice game in the gaming room. The evidence shows that he was on occasions in the room, but generally his place was shown to be at the door where he was immediately at hand. From his station at the door, appellant could not see into the room. It is not, however, shown that he could not hear what transpired in the gaming room.

Under the evidence, we think that the charge given fully protected appellant's rights in this regard.

Appellant also complained of the court's refusal to instruct the jury that they could not consider the acts, declarations and conduct of the alleged co-conspirators done and made out of the presence of the appellant as any evidence of the formation of a conspiracy between appellant and such alleged co-conspirators to commit the offense charged.

The testimony as to declarations and acts of those engaged in the banking of the dice game while appellant performed his part in connection therewith by acting as watchman or doorman was properly admitted as part of the res gestae, though the acts or declarations occurred out of the presence and hearing of appellant. It was original evidence of the very transaction upon which the state relied for conviction.

The court properly refused to instruct the jury to disregard such. See 18 Tex. Jur. 208, Sec. 118; Branch's Ann. P.C., p. 352, Sec. 694.

Also there was no occasion for an instruction to the jury regarding the use of such testimony as evidence of the formation of a conspiracy between appellant and his co-defendants.

It may be noted that none of the declarations of the co-defendants mention or refer in any way to appellant or to his part or connection with the keeping of a gaming bank. His participation as a principal was shown by his own acts and conduct.

Keeping a gaming table and bank, as denounced by Art. 619, P.C., is an offense continuous in its nature. The words "keep" and "keeping," as used in the statute mean holding a table in readiness for the purpose of obtaining bettors. See 20 Tex. Jur. 644-645, Secs. 34 and 35.

The trial court properly permitted the state to prove as part of the res gestae the acts of appellant and his co-principals in regard to the operation of the dice game on June 11 and June 18 as well as on June 26. The evidence shows the keeping of a gaming table and bank as prohibited by Art. 619, P.C., and not merely a dice game constituting a misdemeanor. Authorities cited are therefore not applicable.

Appellant further contends that this case should be reversed because of the district attorney's comment upon the failure of the defendant to testify. This matter is presented by Bill of Exception No. 1 which was qualified by the court, and reflects the following:

Mrs. Fannie Lewis, the mother of the appellant, testified in his behalf.

During her testimony, in response to questions asked her by

the defendant's attorney, Mrs. Lewis testified that the defendant was in the Air Corps during the last war, and said attorney for the defendant then asked her whether or not, during that time, he contracted any disease or disability, to which question Mr. Wilson, the District Attorney, objected on the ground that it was immaterial and prejudicial. Upon being asked by the court to state its materiality, the defense attorney stated in open court in the presence of the jury that he wanted to show on his discharge he was unable to perform certain work and that by reason of his deformity and disease contracted, he was unable to do certain kinds of work. The court then sustained the objection to further testimony along this line.

Appellant did not testify, and no other witness testified or was examined concerning any disability of appellant.

In his argument, one of appellant's counsel commented upon the offered testimony and the court's ruling thereon in the following language:

"I don't know what Mr. Lyerly was trying to say about what kind of work Mr. Lewis (defendant) did. You remember that they objected to us trying to show what kind of work he was capable of."

The language of the district attorney claimed to constitute a comment upon appellant's failure to testify was used by him in objecting to such remarks of appellant's counsel, as follows:

"We are going to object to that—never any question asked him about what kind of work he did."

Thereupon the following occurred:

"MR. MARTIN: We asked his mother and he objected to it.
"MR. WILSON: They asked about an entirely different matter. They never did say whether or not he was capable of work or whether or not he had any disability.
"MR. TEMPLETON: May we have time out for this, Your Honor, from the argument?
"MR. MARTIN: I want to take exception to Counsel's remark.
"THE COURT: Gentlemen of the Jury, you will not consider for any purpose the reference or statement, if it was made— my mind is not too clear on just what was said—but, anyway, anything to that effect, you are instructed not to consider it for any purpose.
"MR. MARTIN: Now, may it please the court, the Court had done everything it could do. It is my duty to except to the re-

marks, even though the Court has told the jury not to consider it, for the purpose of the record."

Appellant sought to have the court certify that the district attorney, in making his objection, pointed at the defendant, but he did not so certify. Instead the qualifications to the bill show that during such objections the district attorney gesticulated and glanced in the direction of the counsel table where the defendant and his attorney were seated.

The qualifications also contain the following:

"This (referring to the mother's testimony) was all the testimony in the record in any way bearing on the question of the defendant's inability to perform certain kinds of work, etc., and the court thought that the District Attorney was referring to such occurrence, but out of precaution sustained the objection to the remarks and instructed the jury not to consider them."

Also the following:

"When Mr. Martin first made his objection as above recited, he immediately wrote out a written request for instructions to the jury to disregard said argument, in which he stated that such argument was a reference to the failure of the defendant to testify. He came up to the bench, and Mr. Martin presented his written request and objection to said argument, whereupon the District Attorney stated that he was not referring to the defendant in said statement, but was talking about the testimony of the defendant's mother. At this point the court gave the instructions above quoted to the jury, instructing them to disregard said statement. The above conversation between the court, Mr. Martin, and the District Attorney occurred in the presence of the jury, but in an undertone and was not heard by the jury."

The argument objected to was "You remember that they objected to us trying to show what kind of work he was capable of. We had a right to do it."

It was manifestly an improper argument, one which was unjustly critical of the court's ruling and based upon evidence rejected upon valid objection.

The court having sustained the objection, it was improper for counsel to comment upon it, and to argue to the jury that the court should have permitted the evidence to be offered.

The objection made, except for the use of the word "him," did not suggest the identity of the person referred to as the defendant.

Appellant's counsel, in reply to the objection, remarked that the question was asked appellant's mother.

If the argument made by defense counsel had been based upon an objection to a question propounded to any male witness, it could not be seriously urged that the district attorney's remark referred to the defendant, or to any person who did not testify.

Assuming the excluded testimony to have been offered by a male witness, the record would show that appellant's counsel stated to the jury "You remember that they objected to us trying to show what kind of work he (appellant) was capable of," to which the district attorney objected, remarking "Never any question asked *him* about what kind of work he did."

One of appellant's counsel directed attention to the fact that the witness whose testimony he was discussing was a feminine witness, for he replied to the district attorney's objection "We asked his mother and he objected to it."

The district attorney must have had reference to the same witness and incident for he took issue with appellant's counsel saying "They asked about an entirely different matter. They never did say whether or not he was capable of work or whether or not he had any disability."

Also, if the district attorney had used the pronoun "her" instead of "him," there clearly could be no basis for the contention that his remark was a comment upon appellant's failure to testify.

The remarks of the district attorney were made to the court in an objection, and not to the jury in argument. The remarks, at the time made, unaided by the reply of appellant's counsel were understood by the trial court, and by at least one of appellant's counsel to refer to the testimony of Mrs. Lewis, she being the only witness who was examined regarding any disability of appellant, and the district attorney, though intending the objection to go to the argument concerning the sustaining of the objection to the question propounded to Mrs. Lewis, by

inadvertence or otherwise, used the word "him," instead of "her."

Properly construed, we think that the district attorney's objection was directed to the argument of defense counsel regarding the court's ruling on the testimony of appellant's mother.

And if by any construction, the language used by the district attorney should have been understood or construed by the jury to have reference to appellant and to his failure to testify, the remarks were no more than a bare allusion thereto. The remarks of the district attorney in no wise detracted from the court's instruction to the jury in his charge to the effect that appellant's failure to testify could not be considered against him, nor were the remarks prejudicial to appellant.

This court has held that a bare allusion to the failure of the defendant to testify, incidentally made, will not operate a reversal of the case. See Johnson v. State, 139 Tex. Cr. R. 279, 139 S.W. 2d 579, 581, and cases there cited.

We are indebted to able counsel for well prepared briefs and argument which have assisted us in passing upon the difficult questions presented on this appeal.

No reversible error appearing, the judgment is affirmed.

Opinion approved by the court.

### ON MOTION FOR REHEARING.

MORRISON, Judge.

Appellant has presented this court with a most comprehensive and all embracing brief on motion for rehearing. The theme thereof seems to be set by the following two contentions contained therein:

(1) "The complaint we are urging to the charge on the question of co-conspiracy was a substantive defensive issue and the law of principals has nothing to do with it."

(2) "In this case the State was attempting to show that the defendant was a principal by the introduction of hearsay testimony."

With this contention we cannot agree in this case.

The state showed that a felony gambling transaction took place and that appellant was, by his own acts and declarations, not those of his co-principals, shown to have been sufficiently connected with the commission of the felony to authorize a jury to convict him. Not a word uttered by them nor an act done by them connected appellant with the commission of the felony. It was his own acts which did so. In view of this analysis of the facts, we hold that the charge on acts and declarations of co-conspirators was not required and was, therefore, favorable to accused and not error.

We predicate our holding in this case on the proposition that *appellant was present,* and that term has been defined by this court, *during the entire transaction and* therefore *the question of acts and declarations of his co-principals in his absence passes out of the case.*

This court is reluctant to pass over without full discussion any complaint raised by appellant's able counsel, but we are not impressed with his claim of injury by what he alleges to have been a comment by the district attorney on appellant's failure to testify. At most it was a bare allusion which would not warrant a reversal.

Appellant's motion for rehearing is overruled.