**Arturo CASILLAS, Jose Aguilar and Omero Luna, Appellants,**

v.

**STATE of Texas, Appellee.**

No. 304–84.

Court of Criminal Appeals of Texas, En Banc.

July 2, 1986.

assessed Amaya's punishment at ten years confinement in the Texas Department of Corrections and a $10,000 fine; the other four appellants each were assessed confinement in the Texas Department of Corrections for a period of twelve years and one day and a $10,000 fine. The appellants were tried jointly, and their appeals were jointly submitted to the Austin Court of Appeals. That court affirmed the judgments of conviction in an unpublished opinion. *Casillas, et al.* (Tex.App.—Austin, Nos. 3–82–216–CR(T)—3–82–220–CR(T), delivered Nov. 30, 1983). We granted appellants' petitions for discretionary review to examine the Court of Appeals' holdings: (a) that the evidence was sufficient to support the convictions; and (b) that the trial court's refusal to submit requested limiting charges concerning the existence of a conspiracy and the co-conspirator exception to the hearsay rule was not error. We will affirm the decision of the Court of Appeals and the convictions of Casillas, Aguilar and Luna in this opinion. We reverse the convictions of Amaya and Hernandez for insufficiency of the evidence in a companion opinion. See *Amaya v. State,* 733 S.W.2d 168 (Tex.Cr.App.1986).

Gerald H. Goldstein, John Convery, Warren Weir, Mark Stevens, San Antonio, for Casillas and Luna.

Albert A. Pena, III, Corpus Christi, for Aquilar.

Ronald Earle, Dist. Atty., and Terrence Keel, Asst. Dist. Atty., Robert Huttash, State's Atty., Austin, for the State.

OPINION ON APPELLANTS' PETITION FOR DISCRETIONARY REVIEW

MILLER, Judge.

Arturo Casillas, Jose Aguilar, Omero Luna, Robert Amaya, and Fernando Hernandez were convicted by a jury for the offense of misapplication of fiduciary property in an amount exceeding $10,000. See V.T.C.A. Penal Code, § 32.45. The jury

## I. FACTS

The facts of this case are rather complex, involving many characters and numerous acronyms. We summarize them here, and elaborate further in our discussion of the sufficiency of the evidence.

In 1969 the Mexican American Council for Economic Progress (MACEP) was formed as an anti-poverty, non-profit organization in Austin, Texas. In 1973, MACEP prepared and submitted to the Office of Economic Opportunity (OEO) a grant proposal, pursuant to which MACEP received a $419,000 grant for the economic development of migrant and other seasonally employed farmworkers under Title IIIB of the Economic Opportunity Act of 1964, 42 U.S.C.A. §§ 2861 et seq., repealed, 42 U.S.C.A. § 9912 (West 1983).

Of the $419,000 grant, $150,000 was originally designated to establish an equity loan fund, for purposes of lending "seed"

money to farmworkers who wanted to start their own businesses. Rather than establishing the originally proposed loan fund, it was decided by the OEO representative, at the suggestion of appellant Casillas and another MACEP representative, Mr. Harmon Lisnow, to establish a Minority Enterprise Small Business Investment Corporation (MESBIC), to be licensed and regulated by the Small Business Administration (SBA). The MESBIC was named Tejas Investment Corporation (Tejas), and was licensed on January 24, 1975. The $150,000 was adjusted to $155,000, which MACEP used to purchase 51% of the voting stock in Tejas.

Establishing the MESBIC under SBA regulations required private matching funds of $150,000, which took some time for MACEP to accumulate. Because of the delay, the MESBIC was unable to get its SBA license during the original grant period between June 1, 1973 and May 31, 1974. Therefore a second grant of $350,000 was made to MACEP for the period from June 1, 1974 and May 31, 1975. Meanwhile the OEO was absorbed into the Department of Labor (DOL) in 1973, making DOL the grantor agency of government.

Appellant Casillas was involved in securing the original grant for MACEP, in his capacity as president of MACEP. Appellant Aguilar was vice-president at that time, and appellant Luna was vice-president at a later time. Hernandez was MACEP's bookkeeper, while Amaya was initially a MACEP employee and later became director of the Austin Minority Economic Development Corporation (AMEDC), an organization with informal ties to MACEP.

In September of 1975, with MACEP owning and voting its controlling 51% interest in Tejas, a new board of directors was elected for Tejas. The board consisted of all appellants and one other person, Minnie Briones. At that point Aguilar, Luna and Casillas were also directors of MACEP, and voted MACEP's controlling votes in Tejas; Aguilar was also an officer of MACEP. The new Tejas board of directors responded to a critical withdrawal of private funds by deciding to surrender their MESBIC license, reorganize Tejas into a private investment corporation, and create an additional corporation called Perceptions, Inc. The new Tejas transferred $106,000 to Perceptions, Inc., which in turn made unsecured loans with this money to the individual appellants, who started or purchased their own businesses.

## II. SUFFICIENCY OF THE EVIDENCE

In reviewing the sufficiency of the evidence to support a criminal conviction, we view all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Anderson v. State*, 701 S.W.2d 868 (Tex.Cr.App.1985).

Appellants challenge, in various ways, the sufficiency of the evidence to show a misapplication of fiduciary property under V.T.C.A. Penal Code, § 32.45, which provides:

"(a) For purposes of this section:

(1) 'Fiduciary' includes:

    (A) trustee, guardian, administrator, executor, conservator, and receiver;

    (B) any other person acting in a fiduciary capacity, but not a commercial bailee; and

    (C) an officer, manager, employee, or agent carrying on fiduciary functions on behalf of a fiduciary.

(2) 'Misapply' means deal with property contrary to:

    (A) an agreement under which the fiduciary holds the property; or

    (B) a law prescribing the custody or disposition of the property.

(b) A person commits an offense if he intentionally, knowingly, or recklessly misapplies property he holds as a fiduciary or property of a financial institution in a manner that involves substantial risk of loss to the owner of the property or to a person for whose benefit the property is held."

*A. Misapplication*

Appellants Casillas and Luna argue that no misapplication was shown because no dealing contrary to an applicable agreement or law was demonstrated. First, the only proof of an agreement was that between MACEP and OEO/DOL, while the indictment alleges a misapplication of property owned by Tejas. They argue that Tejas was not a grantee, MACEP and Tejas were separate organizations, there was no showing that Tejas was privy to the agreement with MACEP, and Tejas was governed by its own by-laws but those were not in evidence. Second, Tejas surrendered its SBA license prior to the time the loans were made so SBA regulations prohibiting self-dealing did not apply, and no other law "prescribing the custody or disposition of property," § 32.45(a)(2)(B), supra, was applicable.

At trial, the State approached the misapplication issue by both available avenues, with evidence of the MACEP grant agreement as well as evidence of two laws that were allegedly violated by appellants.[1] The Court of Appeals found that the evidence was sufficient to show that the funds were dealt with contrary to the terms of the government grant. The State argues to this Court, and we agree, that the most cogent theory for misapplication is that appellants violated the applicable conflicts of interest regulation governing SBA licensees, 13 CFR 107.1004 (1975). The regulation was discussed by a State's witness, and a copy of it was in evidence for the jury. It provides, in part:

"A Licensee shall not, directly or indirectly, provide Financing to any of its Associates."

Appellants do not challenge the applicability of this restriction to Tejas as a licensee and themselves as associates, prior to September 26, 1975, and there was testimony that the regulation applied to them. They argue instead that the SBA license was surrendered on that date and that the conflict of interest prohibition no longer applied on November 1, 1975, the date of misapplication alleged in the indictment.

On September 26, 1975, all five appellants were serving on the board of directors of Tejas when the decision was made to revoke the MESBIC (SBA) license and reorganize Tejas into a private investment company with no license. Casillas and Luna were authorized to sign checks for the new Tejas, and Luna was named president to replace Mr. Raul Medina, who was asked to resign. On September 30, Casillas wrote to the SBA in his capacity as president of MACEP to inform them of the decision to revoke the license. Appellants' second communication to the SBA regarding the surrender of the MESBIC license was a letter on November 3, 1975, signed by Luna, Casillas and Aguilar in their capacities as officers of Tejas, which purported to provide "the information required by SBA to surrender a MESBIC license." The letter clearly suggests its authors' recognition that the license could not be revoked unilaterally, as it provides the information required by SBA regulation for the surrender of a license, 13 CFR 107.105 (1975).[2] Finally, the State's witness from the SBA,

---

**1.** The second law advanced by the State at trial is Art. 2.41 A(4), Tex.Bus.Corp.Act (Vernon's 1986), which imposes joint and several liability upon directors of a corporation who vote for or assent to the making of a loan to an officer or director. We note that this law imposes only limited civil liability, of directors to the corporation until the loan is repaid, and is not a law "prescribing the custody or disposition of the property" as contemplated by V.T.C.A. Penal Code, § 32.45, supra. Examples of laws which do fit § 32.45, supra, are the duties imposed on trustees by the Texas Trust Code, §§ 113.051–113.055 (Vernon's 1984). For example, § 113.-052 states, in part: "Except as provided by Subsection (b) of this section, a trustee may not

lend trust funds to ... the trustee or an affiliate; ...."

**2.** 13 CFR 107.105, "Surrender of License," provides:

"A license shall not be surrendered without SBA's prior written approval. Request for approval shall be accompanied by an offer of immediate payment of all monies owing to SBA, or by a plan satisfactory to SBA for the orderly liquidation thereof. Upon receipt of Licensee's request, SBA may remove Licensee's name from published lists of Licensees, and conduct an examination or investigation of its affairs pursuant to section 310 of the Act."

Mr. Cyr, testified that the license was subsequently surrendered on November 7, 1975, and stated that the letter (State's Exhibit No. 10) was in compliance with a request by the SBA to Tejas as a condition required for surrender of a license. We conclude that the license was not surrendered until November 7, 1975, and that 13 CFR 107.1004, supra, applied until then.

In the time between the September 26 meeting and the eventual license surrender, events occurred in furtherance of the mutual plan to channel funds from Tejas into the "holding company" (Perceptions, Inc.), and then to appellants' own businesses. On October 23, Perceptions was incorporated, and Amaya and Hernandez were installed as officers of it (while Casillas, Luna and Aguilar remained directors of Tejas, which effectively controlled Perceptions). On October 27 the first installment of capitalization, a check from Tejas for $50,000, was made to Perceptions. State's witness Gene Mendez testified that during the same period in October, he participated in at least two meetings attended by all five appellants where disposition of the Tejas/Perceptions capital was discussed. Types of business ventures for the individual appellants were discussed, as was a division of the available money into amounts of approximately $17,500 for each investment. Testimony by each appellant confirmed these discussions in October. On October 31, $17,000 was paid from Tejas (by a check signed by Luna and Casillas) to the Oak City Inn, a restaurant owned by Luna. On November 1, notes for $18,500 apiece were executed by Hernandez and Aguilar, in favor of Tejas, for loans for investment in a restaurant called La·Copa de Leche which was incorporated on November 7, 1975. Finally, on November 7, a check for $34,000 was written from Perceptions (signed by Amaya and Hernandez) to La Copa de Leche.

After November 7, the arrangement continued, with another $56,000 loaned by Tejas to Perceptions on November 20. Loans to the appellants continued: Taco Village, a restaurant owned by Amaya and Casillas, received $37,000 from Perceptions beginning November 19; and Oak City Inn received $18,500 from Perceptions on November 24. On January 7, 1976, the Tejas shareholders met and decided that Perceptions was not, working out as anticipated and should be abandoned.

■ The evidence thus shows that sometime between September 26, 1975 and November 7, 1975, appellants agreed to set up a corporation, capitalize it with funds from Tejas, and divide up the funds approximately equally among themselves in the form of loans to businesses they would own. Prior to November 7, the SBA conflicts of interest regulation was in force and prohibited the course of conduct engaged in by appellants.[3] Having reviewed the evidence under the standard of *Jackson v. Virginia,* supra, we find that a rational trier of fact could have found a misapplication beyond a reasonable doubt.

## B.  Substantial Risk of Loss

Appellant Aguilar adopts the above argument, and adds a challenge to the sufficiency of the evidence to show a "substantial risk of loss" under V.T.C.A. Penal Code, § 32.45(b), supra. He argues that loans made by Tejas were inherently risky because they were intended as seed money for minority business enterprises, relaxed standards were used by the loan committee in approving such loans, and the loans were often unsecured. Compared to the typical Tejas loan, Aguilar maintains, those to the

---

**3.** We note the collateral issue raised in appellants' brief, whether the SBA regulation is a "law" within the meaning of § 32.45, supra. "Law" is defined in V.T.C.A. Penal Code, § 1.07(20) to include "a rule authorized by and lawfully adopted under a statute." (The trial court's instructions to the jury included this definition from the Penal Code.) The regulations codified at 13 CFR 107 *et seq.* are rules authorized by Congress and lawfully promulgated by the SBA. See 15 U.S.C.A. § 687(c) (West 1976). In addition, when this Court reaffirmed its judicial notice of the laws of the United States in *Plaster v. State,* 567 S.W.2d 500 (Tex.Cr.App.1978), it specifically noticed two sections in Title 41 of the Code of Federal Regulations. We conclude from both § 1.07(20) and *Plaster,* supra, that 13 CFR 107.1004 is a law within the meaning of Art. 32.45, supra.

appellants did not involve a substantial risk of loss because all of the appellants had good credit ratings, had done business with the bank where Tejas had its account, were considered honest, and agreed to invest their personal money in their businesses along with the Tejas funds. Aguilar also argues that each appellant's venture was examined by the group to determine its feasibility to merit a loan and that the loans were evidenced by written notes. Finally, Aguilar notes the testimony at trial that banks and corporations "often" lend money to their own directors. He concludes that the State's evidence that the loans were unsecured and self-enforced is insufficient to show a substantial risk of loss.

The phrase "substantial risk of loss" is not defined in the Penal Code, was not defined in the trial court's charge to the jury, is not discussed in the State's brief to this Court, and is not addressed by any decisions of this Court.[4] The Amarillo Court of Appeals recently discussed the phrase in *Bynum v. State,* 711 S.W.2d 321 (Tex.App.1986, no pet.), where the defendant argued insufficiency of the evidence to prove, *inter alia,* a substantial risk of loss. The court applied the "cardinal rule" of statutory construction that when words are

not defined in a statute, the words "employed are ordinarily given their plain meaning, without regard to the distinction usually made between the construction of penal laws and laws on other subjects, unless the act clearly shows that they were used in some other sense." *Id.,* at 323, citing *Campos v. State,* 623 S.W.2d 657, 658 (Tex.Cr.App.1981). Applying that principle, the court noted the dictionary definition of "substantial" as "constituting substance; or not seeming or imaginary; or not illusive, but real and true," and the definition of "risk" as "the possibility of loss, injury, disadvantage, or destruction." *Bynum,* supra at 323, citing Webster's Third New International Dictionary (1976). The court concluded from the facts of that case that the jury was entitled to conclude that the defendant's handling of the funds in question created a "real possibility of loss." *Bynum,* supra at 324.

For further guidance on the meaning of "substantial risk of loss," we turn to the provision of the Model Penal Code that is cited in the Historical Note, Comparative Laws portion of V.T.C.A. Penal Code, § 32.45 (Vernon's 1974). See Model Penal Code and Commentaries, § 224.13 (ALI 1980).[5] In Footnote 8 to the Comment on § 224.13, the meaning of "substantial risk

**4.** This Court has only discussed Art. 32.45, supra in one reported case, *Coplin v. State,* 585 S.W.2d 734 (Tex.Cr.App.1979), which involved the scope of the definition of fiduciaries in the statute and in the jury charge. There are only five other cases reported under Art. 32.45. See *Bynum,* supra; *Little v. State,* 699 S.W.2d 316 (Tex.App. —San Antonio 1985, no pet.); *Showery v. State,* 678 S.W.2d 103 (Tex.App.—El Paso 1984, pet. ref'd); *Luffred v. State,* 642 S.W.2d 242 (Tex. App.—Houston [14th Dist.] 1982, no pet.); *Boyette v. State,* 632 S.W.2d 915 (Tex.App.—Houston [14th Dist.] 1982, pet. ref'd).

**5.** Sec. 224.13, Misapplication of Entrusted Property and Property of Government or Financial Institution, reads, in pertinent part:

"A person commits an offense if he applies or disposes of property that has been entrusted to him as a fiduciary, or property of the government or of a financial institution, in a manner which he knows is unlawful and involves *substantial risk of loss* or detriment to the owner of the property or to a person for whose benefit the property was entrusted." (Emphasis added.)

The Background discussion of the offense notes that its essence is a knowing violation of

the restrictions or regulations governing the handling of property, and that no purpose to appropriate the property for the benefit of the actor or another nor any purpose to deprive the owners or lawful beneficiaries of their property need be proved. See also, Practice Commentary to V.T.C.A. Penal Code, § 32.45 (Vernon's 1974). The absence of such purposes is what distinguishes misapplication from forms of theft that are treated under the consolidated theft provisions in § 223.2 of the Model Code, which corresponds to V.T.C.A. Penal Code, § 31.03. This distinction in degree of acquisitiveness prompts the Model Code authors to recommend only misdemeanor status at worst for the offense; they note that Texas is one of the few states that grades the offense as a felony if the property involved exceeds a certain amount. They also note that there is "at least one" jurisdiction (Texas) that allows conviction based merely on a *mens rea* of recklessness for all elements of the crime, including the risk of loss. See Model Penal Code, supra, pp. 358–9, 363. We conclude that Texas is comparatively "tough" on misapplication offenses.

of loss" is clarified by comparing it to one of the definitions for "deprive" from the Definitions for Theft and Related Offenses:

> "Section 223.0(1) defines 'deprive' to include situations where the actor disposes of property 'so as to make it unlikely that the owner will recover it.' The operation of this definition will sometimes make it a close question whether conduct by a fiduciary is a theft under Section 223.2 [Consolidated Theft] or a violation of Section 224.13 [Misapplication]. The difference between the two offenses inheres in the degree of risk of loss involved. If it is 'unlikely' that recovery of property will occur, by which is meant a substantial certainty, then the offense might be theft. If there is a 'substantial risk,' i.e., less certainty of a loss, then the offense might be a misapplication. The line is a subtle one but there can be no escape from having to draw it...."

The applicability of this comparison for our purposes is demonstrated by our own Penal Code's inclusion of a virtually identical definition of "deprive," for theft purposes, in V.T.C.A. Penal Code, § 31.01(3)(C): "to dispose of property in a manner that makes recovery of the property by the owner unlikely."

■ The *Bynum,* supra, discussion of substantial risk of loss comports with that of the Model Code: a "real possibility" of loss is one, we believe, that exists but does not rise to the level of a substantial certainty. It need not have to be "unlikely" that the property will be recovered, but the risk of loss does have to be a positive possibility; we conclude that the risk must be, at least, more likely than not. With this refinement of the issue (as well as the *Jackson v. Virginia* standard) in mind, we review the evidence of substantial risk of loss.

At the outset, we note that the State's brief to this Court wholly fails to address appellant's challenge to the sufficiency of the evidence to show substantial risk of loss. At trial, however, the essence of the State's case for risk of loss was the self-enforced nature of the loans. This issue was most forcefully presented when Luna's grand jury testimony was read to the jury:

> "Q. [BY PROSECUTOR] Now, your check was from Perception?
>
> A. Correct.
>
> Q. So, you owe Perception, Incorporated, which is a total separate entity from Tejas.
>
> A. Correct.
>
> .  .  .  .  .
>
> Q. Who will deposit that check when you write it in October, and who will you make it payable to?
>
> A. I'll probably make it payable to Tejas because Perception is not around any more.
>
> Q. Okay, so if nobody is left in Perception to take the money, then it's up to Tejas to collect the money?
>
> A. (Nodding head affirmatively)
>
> Q. Who, Aguilar?
>
> A. Aguilar, Casillas and Luna.
>
> Q. So, if you don't pay, they'll have to file suit on you?
>
> A. Correct.
>
> Q. If they don't pay, you'll have to file suit on them?
>
> A. Correct.
>
> Q. And if all of you don't pay and don't file suit on each other, everybody just goes on their way without ever repaying the money?
>
> A. I doubt it.
>
> Q. But it could be true?
>
> A. Yes."

The jury also heard testimony in response to hypothetical questions posed to State's witness McClain, an Austin banker who served on the Tejas loan committee. McClain found a substantial risk of loss in response to hypotheticals posed by the State, and described the two factors that formed the basis of his analysis: the self-enforced nature of the loans and the lack of safe-keeping of the note instruments themselves. (The State's hypotheticals included statements about the notes not being kept in a safe place; see discussion below.) On cross-examination, he stated that the other factors presented by the defense, such as putting their own money

into the ventures, the purpose of the enterprise, or the credit rating of the debtor, would not even enter into his consideration until both of the above elements were resolved. Finally, McClain explained on cross-examination that loans by banks to their own directors were very closely regulated with special rules by state and federal examining authorities, that auditors frown heavily on the practice and request additional information to analyze it, and that all this special consideration for the practice is precisely because of the risk of loss involved.

The State also presented witness Yeakel, an Austin corporate attorney who also served on the Tejas loan committee, and who testified as to the liability of corporate directors who vote for or assent to loans to themselves or other directors. (See Tex. Bus.Corp.Act § 2.41 A, discussed supra, Footnote 1.) Yeakel testified that the practice of directors making loans to themselves is never proper in his opinion, and that he always advises clients against it. He responded to a State's hypothetical, similar to those presented to McClain, with the opinion that a substantial risk of loss was involved.

The defense presented witness Hayes, an Austin banker who had had numerous dealings with all the defendants and testified as to their good credit ratings and honesty, as argued by Aguilar. Contrary to Aguilar's characterization of his testimony, however, Hayes did not say that banks and corporations "often" loan money to their directors. He stated, in response to the question of whether loaning money to directors was not unusual, merely that the practice was "not unusual."

◼ Aguilar also argues that "the loans were evidenced by written notes," and notes that McClain's responses to the hypothetical questions were qualified when the defense stipulated that there were written notes, safely kept. Clearly, the presence or absence of written evidence of the debt, securely kept, was important to McClain's opinion. In fact, the jury was told of the

appellants' intention to use written notes, but was initially presented only with the two notes executed by Hernandez. Aguilar's two notes did not surface until he testified in his own defense at trial, saying that he found them in the files at his restaurant. Other appellants' testimony indicated that their notes were lost in the files of Tejas when Tejas was moved out of its rented office space. The impression left by our review of the record is that the self-enforced nature of the loans was reinforced by a system of storing the written evidence of the debts that was subject only to the control of the appellants: money was borrowed from Tejas (or Perceptions, controlled by Tejas), notes were executed to Tejas (or Perceptions, depending on when executed), and the notes were kept either by the debtor himself or by Tejas, controlled by Casillas, Luna and Aguilar.

Aguilar further maintains that the defense demonstrated the inherent risk in minority-enterprise lending. This was amply achieved through testimony about the relaxed criteria Tejas used, compared with a bank or even a non-minority SBA loan. Appellants are in the awkward position of arguing, on one hand, that they are minorities and therefore appropriate recipients of Tejas' seed money (since they never denied lending it to themselves), and on the other hand, that the risk of lending money to them was not high, as it was for the typical Tejas loan. They appear to feel that lending the money to themselves was a good deal for everyone concerned, including Tejas.

Returning to Aguilar's contentions, our review of the record confirms the riskiness of the typical Tejas loan, that the appellants were considered honest and good credit risks, that they jointly reviewed their proposals for feasibility, and that they agreed to invest their personal money in the ventures to insure maximum incentive. Appellants clearly went about their business in a professional, risk-averse manner, and were not launching into enterprises with the intention to fail.[6]

**6.** Cf. *United States v. Levy*, 741 F.2d 915, 922 (7th Cir.1984), *cert. denied*, 469 U.S. 1021, 105

S.Ct. 440, 83 L.Ed.2d 366, a prosecution for will-

Without gainsaying the evidence that leads to that conclusion, we are left with the State's case of unsecured, self-enforced debts, which appellants did not successfully counter. Considering the evidence in the light most favorable to the verdict, we conclude that a rational juror could have found a substantial risk of loss beyond a reasonable doubt.

In conclusion on the first ground of error, we find that the evidence is sufficient to support the convictions of appellants Casillas, Aguilar and Luna. The decision of the Court of Appeals is affirmed on ground of error no. 1.

## III. LIMITING INSTRUCTION

Review was also granted to consider the ground of error raised by Casillas and Luna (as well as Hernandez) that the Court of Appeals erred in holding that the trial court properly refused to give a limiting instruction to the jury concerning the admissibility of co-conspirators' hearsay. At trial, lengthy segments of all five appellants' grand jury testimony was read before the jury, as we have mentioned in our discussion above. After testimony by Amaya and Hernandez was read, the State began to read Aguilar's testimony when the defense objected on the grounds that the loan transactions being discussed were extraneous offenses subject to a motion in limine. The trial court excused the jury, the defense argued that the jury should be instructed to disregard the testimony as to all defendants but Aguilar, and the State argued that all five defendants worked together as a common conspiracy so that the evidence would be admissible against all. The court agreed:

"THE COURT: That will be the ruling of the Court. Even though the defendants are not charged as coconspirators, under the substantive law that the law of evidence relates to the people who act to-

gether is called also a conspiracy rule, and the acts and declarations of one coconspirator is [sic] admissible against the others, even though they were not present when it occurred.

MR. WEIR: [Counsel for Casillas, Luna, Aguilar and Amaya] Then, the Court is not going to instruct the jury on that after it's read to disregard that?

THE COURT: No, sir, I will not at this time. You might re-urge it at the time I prepare the charge, because I might have a broader view or more in depth view of what we have done. But at this time I'll deny it."

At the close of evidence, the court denied appellants' special requested jury instructions defining conspiracy and seeking to limit the use of co-conspirators' testimony, citing *Lewis v. State*, 155 Tex.Cr.R. 544, 237 S.W.2d 293 (1951) (On Motion for Rehearing). The court made no instruction of its own limiting the use of co-conspirators' hearsay.

The Court of Appeals addressed this issue briefly, stating:

"Although there are numerous cases regarding such a charge, it seems that a charge is not necessary. This Court is in agreement with Professor Ray that whether a conspiracy existed so as to allow admission of testimony of a co-conspirator is a question of law for the Court to determine. 1 Ray, Law of Evidence § 2 (1980). Because the task of determining the existence of a conspiracy is one for the court, no instruction was needed. *See also Massie v. Hutcheson,* 296 S.W. 939 (Tex.Civ.App.1927, writ ref'd). The ground of error is overruled." *Casillas,* supra at slip op. p. 10–11.

■ We agree with appellants that this pays rather short shrift to the issue, but we affirm the Court of Appeals for the

ful misapplication of bank funds under 18 U.S.C. § 657:

"A rational trier of fact could find based on this evidence that appellant had a deliberate plan to channel substantial sums from the Association to his use and to the use of his company. Even though appellant may have

only wanted to borrow the funds and may have had the best of intentions to repay the Association, appellant exposed the Association's funds to a substantial risk of loss. The natural tendency of diverting and spending funds destined for the Association was to harm the Association."

reasons developed below. Briefly, we agree with the State that all of the appellants' own testimony was sufficient to authorize their convictions. In addition, our conclusion comports with the implementation of the new Texas Rules of Criminal Evidence, specifically Rule 104. Before turning to the rules, however, we discuss the applicability of *Lewis,* supra, cited by the trial court and discussed at length in briefs to this Court.

Upon denying appellant's requested charges on conspiracy, the trial court paraphrased *Lewis,* 237 S.W.2d supra at 301, by writing the following on the proposed charge:

"See motion for rehearing in *Lewis* [supra], where it is stated that where a defendant is shown to be guilty by his own acts and declarations and not those of his co-principals (co-parties) a charge on the acts and declarations of co-conspirators is *not* required."

*Lewis* was an illegal gaming case where the defendant was convicted as a principal for being the doorman to the gaming room. He complained on appeal about the conspiracy charge that was submitted to the jury, claiming that it allowed the jury to rule on evidence that was not in dispute. This Court held that the charge did not constitute error because, under the facts, the defendant's own acts and declarations sufficiently connected him with the offense to authorize a jury to convict him, and because no declarations or acts of his co-principals connected him. *Id.* at 301. Appellants rely on the latter distinction to argue that *Lewis* is distinguishable from the case at bar, where the hearsay testimony was extensive and related to the heart of the State's case connecting Luna and Casillas

to the offense. Appellants also make a distinction based on the following language in *Lewis,* supra at 301:

"We predicate our holding in this case on the proposition that appellant was present as that term has been defined by this court, during the entire transaction and therefore the question of acts and declarations of his co-principals in his absence passes out of the case."

Appellants argue that, unlike the testimony admitted in the case at bar, the testimony in *Lewis* was not hearsay since the defendant was present at the time.

The State relies on the same passage from *Lewis,* supra, to argue that the case indeed turned on the fact of the defendant's presence throughout the transaction. Therefore, any problem of linking the defendant to the crime through the acts or declarations of other parties to the offense (done or said in the defendant's absence) is irrelevant. We agree. This Court pointed out twice in the paragraph preceding that quoted above that the defendant's own acts and declarations showed that he was sufficiently connected with the commission of the felony to authorize a jury to convict him. *Id.* The limiting instruction given in the *Lewis* case, over the defendant's objection, was harmless and arguably to the defendant's benefit.[7] This conclusion comports with the principle that where evidence which otherwise would be inadmissible is proven by some other testimony, no reversible error is shown. See *Mutscher v. State,* 514 S.W.2d 905, 922 (Tex.Cr.App. 1974).

We agree with the State that appellants advance no valid justification for the charge in their case, where each of the hearsay declarants was at trial, took the

---

7. The State notes a distinction between *Lewis* and the instant case which is ironic: Lewis wanted the trial court to exclude the instruction which appellants sought. The charge admonished the jury not to consider any declarations by co-principals, made outside the defendant's presence, *if any,* unless the jury found beyond a reasonable doubt that a conspiracy existed between the declarant and the defendant. Lewis thus argued that because uncontroverted evidence showed the declarations were made outside his presence (he was on a staircase guard-

ing the door), the court's charge requiring the jury to resolve whether or not there was such evidence amounted to a comment on the weight of the evidence. This Court did not reach the novel question, holding instead that the defendant was constructively present when the declarations were made. In the instant case, appellants sought a charge which, in view of the extensive evidence of a conspiracy (much of which they supplied themselves), was arguably a comment on the weight of undisputed facts.

stand, and testified to virtually the same decision to lend money to themselves as adduced by reading the grand jury testimony. The defensive theory appears to have been that the State could not show a misapplication even with in-trial admissions of the transactions in question. Reliance on that theory was misplaced, because it seems to have assumed that the SBA conflicts of interest regulation was inapplicable. Appellants' assumption that their unilateral revocation of the SBA license on September 26, 1975, freed them to engage in self-lending was erroneous, as we hold above.

In addition, the same result is indicated by the Texas Rule of Criminal Evidence 104(a), (effective September 1, 1986) which states:

"Questions of admissibility generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges."

In *United States v. James*, 590 F.2d 575 (5th Cir.1979), the Fifth Circuit interpreted for the first time the effect of Federal Rule of Evidence 104(a) on their practice. Prior to the rule, the procedure for admission of out-of-court statements by alleged co-conspirators was like Texas practice, sharing the responsibility between judge and jury. First, the judge made a preliminary determination to whether the alleged conspiracy existed and that the declarant and defendant were members. Then the jury was instructed that it could consider the evidence against a particular defendant only if it first determined that the conspiracy existed, that the declarant and defendant were members of it, and that the statement was made during the course and in furtherance of the conspiracy. *Id.* at 578.

Rule 104 changed that practice, requiring that the judge alone make the determination of the admissibility of the evidence. The policy behind this conclusion stems from the danger that a jury might convict on the basis of co-conspirator statements without first dealing with the admissibility question. The jury's function, under Rule 104(b), "Relevancy conditioned on fact," [8] is to address preliminary questions which present no such danger of prejudice to the defendant. *Id.* at 579–80.

We have adopted our new Rules of Criminal Evidence with identical language in Rule 104 as the Federal Rules (and the Texas Civil Rules). We agree with the reasoning in *James*, supra, regarding the functions of judge and jury under the rule [9] and hold that the same result is indicated under Texas Criminal Rule of Evidence 104.

We thus overrule appellants' second ground of error. The decision of the Court of Appeals is affirmed as to appellants Casillas, Luna and Aguilar.

ONION, P.J., not participating.

TEAGUE, J., dissents.

---

**8.** Rule 104(b) states: "When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition."

**9.** We specifically do not reach the other issues discussed in *James,* and reserve them for discussion when they are raised. See *James,* supra at 584–594 (Tjoflat, J., specially concurring).