Becker v. State






COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

)
JOSE SALCIDO,                                              )                  No. 08-04-00286-CR
)
                                    Appellant,                        )                             Appeal from
)
v.                                                                          )                  41st District Court
)
THE STATE OF TEXAS,                                   )                  of El Paso County, Texas
)
                                    Appellee.                          )                  (TC# 20040D02116)

O P I N I O N

            Jose Salcido appeals his convictions of theft over $1,500 aggregated (Count I) and
misapplication of fiduciary property over $1,500 aggregated (Count II). A jury found Appellant
guilty, found the enhancement allegations true, and assessed his punishment on each count at a fine
of $10,000 and imprisonment for a term of fifteen years and six months. We affirm.
FACTUAL SUMMARY
            Appellant placed advertisements in the Shopping Guide and the El Paso Times for credit
repair services and for assistance in obtaining home loans and car loans by those with bad credit. 
In September 2001, Yolanda Valdez saw the ad in the Shopping Guide and called Appellant to
discuss repairing her credit. Appellant met with Valdez in her home and explained what he could
do. Valdez gave him several payments totaling $409 for credit repair services and another $500 as
a down payment on a new car. While Valdez signed an agreement with National Credit Repair, she
made the checks payable to Appellant rather than the credit repair agency. When Valdez tried to buy
a Pontiac, the auto representative said he did not understand why Appellant had requested a down
payment from her. Valdez did not get the car loan. When she threatened to call the police,
Appellant paid her $500 but claimed he had “lost” the remaining $409. 
            In November 2001, Gina Simental saw the ad in the El Paso Times and called Appellant. 
She explained that she and her husband wanted to purchase a house but they had poor credit due to
medical bills. Appellant told her that it wouldn’t be a problem because they were first-time home
buyers and a program existed which could help them. Simental met with Appellant at Ed Walsh &
Associates and he obtained detailed information about her finances and credit history. He introduced
her to a credit repair program known as ICR and charged her $260. Simental paid by credit card. 
Her husband later met with Appellant and paid another $260 to repair his credit. Appellant advised
the couple that they could purchase a home after ICR had repaired their credit. He suggested that
they let him know when they had found a house. Once they found a house, Appellant said he would
negotiate the purchase price and asked how much of a down payment they could afford. They gave
him three checks totaling $2,400 as a down payment. Although the checks were made payable to
“Home Buying,” they were endorsed by Appellant’s friend, Mary Lou Gasca, who gave the money
to Appellant. The Simentals’ credit was not repaired and Appellant kept the money. He explained
that he couldn’t return the money because he had “wasted it.” He also apologized and admitted he
had done this before. He even provided the name of a detective to contact. Appellant eventually
returned $50 to the Simentals. 
            In November or December 2001, Debbie Gass saw Appellant’s advertisement in the
newspaper. Appellant met with Gass and her husband at their home. He told them there were
programs to help people reestablish their credit and get into a home. Appellant accepted their check
for $500 and encouraged them to begin looking for a house. When they found a home, Appellant
told them he would negotiate with the sellers and they should not talk to the sellers themselves. 
Appellant did not repair the couple’s credit or assist them with the purchase. He eventually refunded
$200. 
            Dallas Henry Pridgen contacted Appellant in November 2001 to obtain a debt consolidation
loan. He paid $500 in order to obtain the loan. Appellant took an application and told him that a
woman would contact him by telephone to get additional information. A woman later called Pridgen
and asked him more questions but he did not get the loan. Pridgen called Appellant and asked him
what had happened. Appellant replied that he had not been able to “pull it off” and he could not
return Pridgen’s money because he had spent it. As he had done with the Simentals, Appellant told
Pridgen that he had a problem and he gave him the name of a detective. 
            In January 2002, Victor Alonzo spoke with Appellant about his credit problems and his
desire to buy a home. Appellant said he would charge $500 to repair the credit. Alonzo paid $400
in cash and told Appellant he would pay another $100. Appellant told him to start looking for a
house. When Alonzo found a place, Appellant told him that a larger down payment would reduce
the monthly payments. Alonzo said he expected to receive a $1,000 income tax refund but he had
not yet prepared the return. Appellant gave Alonzo a ride to get his income tax return prepared and
filed electronically and later drove Alonzo to pick up the refund check and cash it. Alonzo gave
Appellant $900 as a down payment on the house. Appellant did not repair Alonzo’s credit or assist
him with the purchase of the house. When Alonzo finally made contact with Appellant after
numerous attempts, Appellant told him that he had spent the money and gave him the name of a
detective. Appellant eventually repaid $800. 
            Irma Lopez saw Appellant’s ad in February 2002. She told Appellant that she had bad credit
and needed help to buy a house. Appellant asked her to pay $500 to start the paperwork. Lopez
borrowed the money and paid him. Appellant then told her that she needed to pay between $2,500
and $4,000 as a down payment for a house. Lopez gave him $2,500 in cash. When her subsequent
efforts to contact Appellant by telephone were unsuccessful, she went to the office of Maria Walsh,
the operator of a credit services business. Appellant had previously given Lopez one of Walsh’s
business cards. Appellant happened to be there. At first, he told Lopez that her paperwork was
being processed but when she threatened to call the police, he spoke with Walsh privately. Walsh
gave Lopez a check for $2,300, but Appellant did not refund the remainder of the money Lopez had
paid him. 
            In February 2002, Lorraine Amezaga called Appellant in response to his ad in the Shopping
Guide. She wanted to purchase a home but she had been paying some bills late. Appellant set up
a meeting with Amezaga and her husband at their residence. Amezaga gave Appellant $500 to start
the paperwork. He said he would get back with them but if they had more money, the process would
go faster. The Amezagas were interested in purchasing a particular home and Appellant even went
with them to look at it. They gave Appellant an additional $3,500 as a down payment. Although
he represented that he would speak to sellers, he failed to do so and did not respond to the couple’s
telephone calls for approximately two weeks. When the Amezagas could not find Appellant, they
called the police. The officers arrived at the home and Ms. Amezaga called Appellant. She left a
message that she had an additional $2,000 to give him. Although Appellant had been avoiding her
calls for two weeks, he returned this one within half an hour and said that he could stop by her house
and pick up the money. The police officers moved their car and waited for Appellant to arrive. They
questioned him and he immediately refunded $3,500 to the Amezagas from a money bag that he had
with him. He signed a letter stating that he would refund the remainder or the Amezagas would
press charges. Appellant refunded all but $200. 
            In July 2002, Jim Burek hired Appellant to appraise a commercial building. Burek paid
$1,200 in cash. Appellant never performed the appraisal and Burek was unable to contact him. 
Burek subsequently saw a news story on television about Appellant. 
            Rudy Trujillo works for Jaguar of El Paso. In July 2002, Trujillo found a Honda Odyssey
van that he wanted to purchase but he could not obtain a loan. Someone at the dealership told him
that Appellant was a loan officer and could help him obtain a car loan. Trujillo called Appellant and
met with him at a Denny’s restaurant. Appellant told Trujillo that he works with people who have
a hard time getting credit and he could help him obtain the financing. Appellant said that he would
need $600 as a downpayment to get the loan started through the bank. Trujillo did not have the
money with him but he paid Appellant approximately a week later. Appellant gave Trujillo a receipt
and told him that he would get a full refund if the loan were not approved. After a few days,
Appellant told Trujillo that the loan had been approved and he would be receiving the check within
a couple of days. Trujillo continued to wait for the check but in the meantime, he saw a news story
about Appellant on television. Trujillo tried to call Appellant’s cellphone but the number was not
working. Trujillo did not get the loan and Appellant did not refund any of his money. 
            Paul Macias and his wife were referred to Appellant about a car loan. They met with
Appellant at a restaurant and he explained how he could help them obtain the financing. At a second
meeting in July 2002, Macias gave Appellant a downpayment of $2,000 to start with the paperwork. 
Two days later, Appellant advised him that the loan had been approved and to start looking for a
car. They found a vehicle, but Appellant did not obtain the financing for them nor did he return the
downpayment. 
            Count I of the indictment alleged that Appellant, pursuant to one scheme or continuing course
of conduct, unlawfully appropriated currency from Lorraine Amezaga, Gina Simental, Dallas
Pridgen, Rudy Trujillo, Paul Macias, Jim Burek, Victor Alonzo, Irma Lopez, Yolanda Valdez, and
Debra Mitchell Gass without their effective consent and with the intent to deprive them of the
property. The jury found Appellant guilty of theft over $1,500 as alleged in Count I of the
indictment. Count II of the indictment alleged that Appellant, pursuant to one scheme and
continuing course of conduct, intentionally and knowingly misapplied currency that he held as a
fiduciary contrary to law or an agreement under which he held the money and in a manner that
involved substantial risk of loss to Lorraine Amezaga, Gina Simental, Dallas Pridgen, Rudy Trujillo,
Paul Macias, Jim Burek, Victor, Alonzo, Irma Lopez, Yolanda Valdez, and Debra Mitchell Gass. 
The jury also found Appellant guilty of misapplication of fiduciary property over $1,500 as alleged
in Count II. During the punishment phase, the jury found that Appellant had three prior theft
convictions as alleged in the enhancement paragraphs, and the jury assessed his punishment at a fine
of $10,000 and imprisonment for a term of 15 years and six months. 
SUFFICIENCY OF THE EVIDENCE
            Appellant raises two issues challenging the legal and factual sufficiency of the evidence
supporting his misapplication of fiduciary property and theft convictions.
Standards of Review
            In reviewing the legal sufficiency of the evidence to support a criminal conviction, we must
review all the evidence, both State and defense, in the light most favorable to the verdict to
determine whether any rational trier of fact could have found the essential elements of the offense
beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61
L.Ed.2d 560, 573 (1979); Geesa v. State, 820 S.W.2d 154, 159 (Tex.Crim.App. 1991), overruled on
other grounds, Paulson v. State, 28 S.W.3d 570 (Tex.Crim.App. 2000). We do not resolve any
conflict of fact or assign credibility to the witnesses, as it was the function of the trier of fact to do
so. See Adelman v. State, 828 S.W.2d 418, 421 (Tex.Crim.App. 1992); Matson v. State, 819 S.W.2d
839, 843 (Tex.Crim.App. 1991). Instead, our duty is only to determine if both the explicit and
implicit findings of the trier of fact are rational by viewing all of the evidence admitted at trial in a
light most favorable to the verdict. Adelman, 828 S.W.2d at 422. In so doing, any inconsistencies
in the evidence are resolved in favor of the verdict. Matson, 819 S.W.2d at 843. Further, the
standard of review is the same for both direct and circumstantial evidence cases. Geesa, 820 S.W.2d
at 158.
            In reviewing factual sufficiency of the evidence to support a conviction, we are to view all
the evidence in a neutral light, favoring neither party. Johnson v. State, 23 S.W.3d 1, 7
(Tex.Crim.App. 2000); Clewis v. State, 922 S.W.2d 126, 129 (Tex.Crim.App. 1996). In Zuniga v.
State, 144 S.W.3d 477, 484 (Tex.Crim.App. 2004), the Court of Criminal Appeals clarified the
factual sufficiency standard and linked the appellate standard of review to the beyond a reasonable
doubt burden of proof. There is only one question to be answered in a factual sufficiency review:
Considering all of the evidence in a neutral light, was a jury rationally justified in finding guilt
beyond a reasonable doubt? Zuniga, 144 S.W.3d at 484. However, there are two ways in which the
evidence may be insufficient. Id. First, when considered by itself, evidence supporting the verdict
may be too weak to support the finding of guilt beyond a reasonable doubt. Id. Second, there may
be both evidence supporting the verdict and evidence contrary to the verdict. Id. Weighing all the
evidence under this balancing scale, the contrary evidence may be strong enough that the
beyond-a-reasonable-doubt standard could not have been met, so the guilty verdict should not stand. 
Id. at 485. This standard acknowledges that evidence of guilt can “preponderate” in favor of
conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt. Id.
Stated another way, evidence supporting guilt can “outweigh” the contrary proof and still be factually
insufficient under a beyond-a-reasonable-doubt standard. Id. In performing this review, we are to
give due deference to the jury verdict, as well as to determinations involving the credibility and
demeanor of witnesses. Zuniga, 144 S.W.3d at 481.
Elements of Misapplication of Fiduciary Property
            A person commits an offense if he intentionally, knowingly, or recklessly misapplies property
he holds as a fiduciary in a manner that involves substantial risk of loss to the owner of the property
or to a person for whose benefit the property is held. Tex.Penal Code Ann. § 32.45(b)(Vernon
Supp. 2005). “Misapply” means deal with property contrary to: (A) an agreement under which the
fiduciary holds the property; or (B) a law prescribing the custody or disposition of the property. 
Tex.Penal Code Ann. § 32.45(a)(2). The term “substantial risk of loss” means that a real
possibility of loss exists and that the risk of loss is a positive possibility and more likely than not. 
Dwyer v. State, 836 S.W.2d 700, 702 (Tex.App.--El Paso 1992, pet. ref’d).
Analysis
            In both Issues One and Two, Appellant concedes that the evidence established that he was
a fiduciary but he contends that the State failed to prove by legally or factually sufficient evidence
that he intentionally, knowingly, or recklessly misapplied the money given to him by the
complainants. He argues that there is no evidence that he kept the money for himself and it is
possible that the companies he worked with might have some of the money.
            Various complainants testified that they gave Appellant money to repair their credit or as a
downpayment on the purchase of a home or vehicle. Appellant did not apply the money for these
purposes but instead utilized it for himself and others. The evidence at trial included an audio-taped
statement given by Appellant to Detective Stephen Happ who attempted to ascertain what Appellant
had done with the money he collected from the complainants. When asked whether his friend Mary
Lou Gasca had received any of the money, he stated he had only given her “gas money.” Appellant
told Happ that he spent some of the money he had taken from the victims “[j]ust to get things like
to go out or to pay other people.” He explained that he repaid some people out of the money he
collected from others. When asked if there was any money left, he stated, “No. I had about $50 left. 
I spent some last night.” Appellant made similar admissions to the complainants when he explained
that he could not return their money because he had spent, lost, or wasted it.
            Taken in the light most favorable to the verdict, Appellant’s admissions to Detective Happ
and the complainants are sufficient for a rational trier of fact to find beyond a reasonable doubt that
Appellant intentionally, knowingly, and recklessly misapplied the fiduciary property entrusted to him
for the purposes of credit repair and downpayments when he spent the money to “go out,” give a
friend “gas money,” and to repay other victims. See Huett v. State, 970 S.W.2d 119, 125 (Tex.App.--Dallas 1998, no pet.)(evidence was sufficient to support conviction of misapplication of fiduciary
property, even though defendant claimed she was a pawn of her husband; testimony showed that
investment was used by defendant for a great number of personal expenditures unrelated to oil lease
business, including house and car payments, grocery shopping, and clothing purchases).
            We also understand Appellant to argue that his personal use of the money did not create a
substantial risk of loss. The term “substantial risk of loss” means that there must be a real possibility
of loss, that the risk of loss is a positive possibility and is more likely than not. Casillas v. State, 733
S.W.2d 158 (Tex.Crim.App. 1986). As we have already noted, the evidence established that
Appellant used the money not only for his personal use but to repay other victims for whom he had
not performed the promised services. Appellant took money from several victims in the fall and
early winter of 2001. When these complainants confronted Appellant, he said that he did not have
the money and admitted that he had a problem. He even gave them the name of a detective to call. 
Despite this knowledge, he continued to take money from other complainants in 2002. Even after
Appellant was confronted by the police at Lorraine Amezaga’s home in February 2002 and forced
to give her a partial refund, he continued to take money for services he did not provide. At the time
Appellant gave his statement to Detective Happ, he had spent all but $50 of the complainants’
money. A rational trier of fact could find beyond a reasonable doubt that Appellant’s continued
acceptance of money from the complainants, knowing he could not or would not perform the
promised services, and his use of the money to satisfy other financial obligations, presented a real
and positive possibility of loss of those funds. See Dwyer v. State, 836 S.W.2d 700, 702 (Tex.App.--El Paso 1992, pet. ref’d)(evidence supported conviction for misapplication of fiduciary property,
where defendant-accountant knew of severe cash shortages, yet continued to accept utility payments
from customers and applied payments to satisfy other financial obligations rather than forwarding
payments to public utility for credit to respective customers; jury could have found that defendant's
actions created real and positive possibility of loss of the funds). For the foregoing reasons, we
conclude that Appellant’s conviction of misapplication of fiduciary property is supported by legally
sufficient evidence. 
            We have also considered the foregoing arguments without viewing the evidence in the light
most favorable to the verdict. Contrary to Appellant’s assertions, there is considerable evidence that
Appellant used the money entrusted by the complainants to him for personal expenditures and to
satisfy other financial obligations rather than applying the funds for the agreed purposes. Appellant
told Detective Happ that he had tried to get loans through lenders. Appellant found one company
in Florida through the internet, but that company would not do business with him because he did not
have a license. He also made the following statement:
I sent information on some companies that requested like $25, $100, whatever. 
Either some would respond or some would send me information, but it wasn’t what
it appeared to me. In other words, I was seeking. I couldn’t do it here, so I was
seeking and I had spent the money. 

While this constitutes some evidence that Appellant spent these relatively small sums of money in
an effort to find lenders, this does not entirely account for how he expended the large amounts of
money entrusted to him by the complainants. The jury could have reasonably given substantial
weight to Appellant’s admissions that he wasted, lost, and spent the money. We conclude that the
evidence is factually sufficient to prove that Appellant misapplied the fiduciary property. Further,
the evidence is factually sufficient to prove the substantial risk of loss element. Appellant’s
continued acceptance of money from the complainants, knowing he could not or would not perform
the promised services, and his use of the money to satisfy other financial obligations, made it more
likely than not that the funds would be lost. See Dwyer, 836 S.W.2d at 702.
 

Elements of Theft
            A person commits the offense of theft when he unlawfully appropriates property with intent 
to deprive the owner of property. Tex.Penal Code Ann. § 31.03(a). Appropriation of property is
unlawful if it is without the owner’s effective consent. Tex.Penal Code Ann. § 31.03(b)(1). 
Consent is not effective if induced by deception or coercion. Tex.Penal Code Ann. § 31.01(3). 
Deception means, among other things, promising performance that is likely to affect the judgment
of another in the transaction and that the actor does not intend to perform or knows will not be
performed, except that failure to perform the promise in issue without other evidence of intent or
knowledge is not sufficient proof that the actor did not intend to perform or knew the promise would
not be performed. Tex.Penal Code Ann. § 31.01(1)(E); King v. State, 174 S.W.3d 796, 810
(Tex.App.--Corpus Christi 2005, pet. ref’d). “Deprive” means to withhold property from the owner
permanently, or to dispose of property in a manner that makes recovery of the property by the owner
unlikely. Tex. Penal Code Ann. § 31.01(2)(A), (C). The intent to deprive is determined from the
words and acts of the accused. Griffin v. State, 614 S.W.2d 155, 159 (Tex.Crim.App.1981); King,
174 S.W.3d at 810.
Analysis
            With respect to his theft conviction, Appellant argues that the State failed to prove beyond
a reasonable doubt that he appropriated money from the complaining witnesses without their
effective consent since the complainants willingly gave the money to him and there was some
evidence that he intended to perform the services. Appellant relies on the same evidence to argue
that he did not have an intent to deprive the complainants of their property.
            Appellant makes much of Detective Happ’s testimony that he believed Appellant “intended
to somehow make these loans work out even though he probably knew he couldn’t.” But Appellant
told Happ during the interview that he had gone back into the loan brokering business after he got
out of jail for committing the same type of offense because he could not stop. He had returned to
loan brokering with the “original intentions” to do it the “right way” but that it did not “happen that
way.” Appellant initially attempted to obtain loans for some of his customers but the companies
would not work with him because he did not have a license. Despite this knowledge, Appellant
continued to promise to perform services for his complainants and accept their money when he knew
that he could not perform the services, and he continued to spend their money for his own personal
use and to satisfy other financial obligations. When the evidence is taken in the light most favorable
to the verdict, a rational trier of fact could conclude beyond a reasonable doubt that the
complainants’ consent was based on deception as defined in Section 31.01(1)(E), and therefore, was
not effective. This same evidence supports the jury’s finding that Appellant intended to deprive the
complainants of their property. 
            Appellant makes the same arguments in connection with his factual sufficiency complaint. 
We have conducted a neutral review of the evidence and find that it is factually sufficient to permit
a rational trier of fact to conclude beyond a reasonable doubt that the complainants’ consent was not
effective because it was based on deception. We also conclude that the evidence is factually
sufficient to support a finding that Appellant acted with an intent to deprive the complainants of their
property. Having found the evidence both legally and factually sufficient to support the
misapplication and theft convictions, we overrule Issues One and Two. The judgment of the trial
court is affirmed.

May 4, 2006                                                                
                                                                                    ANN CRAWFORD McCLURE, Justice

Before Barajas, C.J., McClure, and Chew, JJ.

(Do Not Publish)