TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-93-00687-CR







Donald Lee Wilson, Sr., Appellant



v.



The State of Texas, Appellee







FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 368TH JUDICIAL DISTRICT 


NO. 93-592-K368, HONORABLE BURT CARNES, JUDGE PRESIDING







 After finding appellant guilty of murder under section 19.02 of the Texas Penal
Code, the jury assessed punishment at confinement for thirty-eight years. See Penal Code 63d
Leg., R.S., ch. 399, Sec. 1, § 19.02, 1973 (Tex. Gen. Laws 883, 913, amended by Act of May
28, 1973, 63d Leg., R.S. ch. 426, art. 2, § 1, 1973 Tex. Gen. Laws 1122, 1123 (Tex. Penal
Code Ann. § 19.02, since amended). Appellant asserts eleven points of error. In his first two
points of error, appellant alleges that the evidence is (1) legally and (2) factually insufficient to
support the verdict. In his remaining points of error, appellant contends the trial court erred in: 
(3) admitting in evidence inadmissible hearsay exhibits; (4) failing to grant a mistrial because the
prosecutor's argument was a personal attack on defense counsel; (5) overruling appellant's
objection to the prosecutor's argument that constituted an improper plea for law enforcement; (6)
failing to grant a mistrial based on the prosecutor's comment on appellant's failure to testify; (7)
overruling appellant's objection to the prosecutor's argument asking the jury to apply the parole
law; (8) admitting inadmissible character evidence; (9) admitting irrelevant evidence regarding
appellant's sexual history; (10) admitting evidence of other crimes, wrongs or bad acts; and (11)
admitting hearsay statements of the deceased. We will overrule appellant's points of error and
affirm the judgment of the trial court.

 Tracy Parsons (the victim) was last seen alive by her roommate when she left her
apartment about 4:30 a.m. on June 18, 1992. The victim was due at work at Sam's Wholesale
Club (Sam's) on North Lamar at 5:00 a.m. Sometime between 4:30 a.m. and 5:00 a.m., the
victim disappeared from her truck in Sam's parking lot. Her skeletal remains were found near
Hutto on November 23, 1992. Dr. Robert Bayardo, chief medical examiner for Travis County,
testified that the most likely cause of death was strangulation or suffocation as a result of some
sort of homicide and violence. Dr. Bayardo also opined that fractures found below an eye and,
inside, under the chewing muscle were inflicted at or about the time of death.

 In reviewing the legal sufficiency of the evidence, we must determine whether,
viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could
have found the essential elements of the offense beyond a reasonable doubt. See Jackson v.
Virginia, 443 U.S. 307, 319 (1979); Cassillas v. State, 733 S.W.2d 158, 160 (Tex. Crim. App.
1986), appeal dismissed, 484 U.S. 918 (1987). The standard of review is the same for direct and
circumstantial evidence cases. Geesa v. State, 820 S.W.2d 154, 162 (Tex. Crim. App. 1991).

 The victim and appellant had lived together but their relationship had deteriorated
prior to May 28, 1992 when the victim entered a Diamond Shamrock store near where they lived. 
Robbie Fouts, an employee, described the victim as "very, very upset." Fouts testified that the
victim told him that all she wanted was to get her clothes and leave; that her boyfriend (appellant)
had raped her and tried to strangle her. Fouts placed a call for the victim to the sheriff's office. 
The victim repeated the complaints about appellant's actions toward her as she had related to
Fouts. Sheriff's deputies met the victim at the station and accompanied her to appellant's
residence in order that she might pick up her clothes. After retrieving her things, the victim left
in her truck to go to a girlfriend's apartment.

 Sean Givens, a long-time friend and fellow employee at Sam's, testified that during
the time the victim was living in her girlfriend's apartment she asked him to help her with a flat
tire. Givens accompanied the victim to a store to purchase a new tire. Upon their return, two
other tires had been slashed. Givens stated that the victim was really upset and crying. She was
worried about something else happening and asked Givens to stay with her. Givens related that
appellant was very jealous and possessive of the victim.

 On June 12, 1992, pursuant to the victim's application, the Travis County Court
at Law issued a temporary ex-parte protective order prohibiting appellant from going within two
hundred yards of the victim. Edward Curry, a deputy constable who had worked as a therapist
with violent males, served the protective order on appellant. Curry testified that after he read him
the protective order, appellant reacted with "anger, intense anger. It was like a pot just fixing to
boil." The order directed appellant to appear before the court on June 25, 1992 to show cause
why the application for protective order should not be granted. Appellant told a friend, Karen
Lightbow, "I really would like to talk to her [the victim] and find out why she's doing this to
me." The victim's roommate, Sherry Kleinert, testified that despite the protective order, the
victim had called appellant in an effort to get her new driver's license that had been mailed to his
address. Kleinert, wanting to help the victim, called appellant to see if she could pick up the
driver's license, but appellant told her that she could not because he was going on vacation.

 The victim disappeared a week before the date set for the hearing on the protective
order. The victim's truck was observed in its usual parking place on Sam's lot on June 18. 
Appellant's automobile service center was across the street from Sam's parking lot and the lot
could be seen "real good" from his shop. On June 19, concern for the victim's whereabouts
resulted in fellow employees examining the victim's truck where it had been parked since the
previous day. The driver's door was unlocked and the victim's billfold and spoiled lunch were
on the seat. An investigation by police officers failed to reveal any violence.

 Diane Monaghan, a latent fingerprint examiner for the Department of Public Safety
(DPS), testified that the victim's fingerprints were found on the inside of the passenger door
window of appellant's vehicle. Appellant's fingerprints were found between the victim's
fingerprints as well as various other places on the inside and outside of the vehicle. It is
undisputed that appellant acquired this vehicle after the victim left him.

 The victim's remains were found in a field of "Georgia cane" surrounded by a
barbed wire fence. Helmer Dahl, owner of the field, described the cane as a perennial plant, "it
just grows on its own." Dahl testified that the field also had "lots of briar bushes" with stickers
that have a tendency to cut you. Following the disappearance of the victim, Albert Arcia and
Kenneth Hooper, friends of appellant, had occasion to see appellant in shorts. Both Arcia and
Hooper testified that appellant had scratches and cuts on his legs. It became a topic of
conversation among his friends. In response to questions such as, "Man, why in the world are
you so scratched up?"--appellant told them he had been fishing earlier that morning.

 Appellant's alibi about his whereabouts at the time of the victim's disappearance
was impeached by the State. The pier where appellant stated he was fishing at the time in
question was shown to have been under water. Appellant did not follow through with prearranged
plans for Thursday, June 18, the day the victim disappeared. He did not return on the following
day, a date he had designated for making out the payroll for his employees. Nor did he take his
neighbor's car to his shop pursuant to an earlier agreement. When asked who took care of his dog
while he was gone, appellant stated that he had asked a neighbor boy, Mike Avila. Avila testified
that he had not been asked to take care of appellant's dog.

 Sergeant Joseph Thompson of the Austin Police Homicide Detail testified that he
called appellant about 8:00 p.m. on November 24, 1992 and asked him to come to the police
station to assist in identifying the remains of the victim that had just been found. Appellant said
he could not come because of a business appointment. Thompson asked appellant if he could
come the next day and appellant agreed "that might work." Appellant did not come to the station
the next day and Thompson said that the initial telephone call was the last time that he talked to
appellant. Thompson stated that appellant showed no emotion or interest. Shortly after
Thompson talked to appellant on the night of November 24, Theresa West was seen entering
appellant's apartment. West testified that appellant told her that the police had called him, that
they had found Tracy's body, and the police wanted him to look at some clothing and a picture. 
West related that appellant told her, "Hell no, I'm not going down there." Appellant told West
that he was going to Magnolia on Thanksgiving and promised West that he would return the
following Monday, a promise that appellant did not keep.

 Sandra Escamilla, appellant's fourteen-year-old daughter by a previous marriage,
testified that appellant called her on the night of November 30, 1992 and told her that "he was on
the run from the police, and they found his ex-girlfriend's body." On December 1, two of
appellant's friends went to Magnolia and persuaded appellant to return to Austin rather than have
someone come after him. West testified that her relationship with appellant continued until
appellant decided to leave for Montana after hearing that a warrant was going to issue for his
arrest. West agreed that appellant could take her truck and that she would retain appellant's older
model car. West was aware that appellant planned to use the alias of Don West. After appellant
left, West found letters that caused her to cooperate with the police in getting appellant to return
to Texas. As the result of a call by West to appellant, it was agreed that West and appellant
would meet in Amarillo. West related that appellant was reluctant to return to Texas, but agreed
to the Amarillo meeting in order that they might spend a night together and exchange vehicles. 
Officers accompanied West to Amarillo and arrested appellant.

 West also testified that while she was living with appellant, he showed her how he
was supposed to have choked the victim that resulted in the protective order. Appellant "took the
back of his arm, and he placed it up against my neck, and he said, and this is how I'm supposed
to have choked Tracy. Do you consider that choking?" West stated that she pushed him off and
told him, "That ain't choking. But that was choking." Sherry Kleinert, testified that appellant
told her that he had forced the victim into sexual intercourse.

 To support his claim that the evidence is insufficient, appellant points out that: (1)
no one witnessed the alleged assault and rape; (2) no one saw any cuts or bruises on the victim
following the alleged assault and rape; (3) no one saw appellant anywhere near the deceased
before her disappearance; (4) no physical evidence was found at the crime scene; (5) no direct
evidence was discovered during the searches of appellant's vehicle and the victim's vehicle; (6)
no direct evidence was found during the search of appellant's house; and (7) appellant's
fingerprints were not found on the deceased's vehicle. Appellant also urges that the evidence
shows that he cooperated with the police; that the deceased could have left her fingerprints on
appellant's car when she was looking for her driver's license; that the medical examiner could not
specifically determine the cause of death or the time of death; and that appellant's testimony shows
that he left Texas because of police harassment. Appellant suggests that there is evidence to show
there were other suspects. Brian Garcia, who lived with the victim's uncle, testified that he had
the victim's lighter after her death. The testimony of Brian Harris reflects that he passed Sam's
parking lot about 5:00 a.m. on the morning in question and observed an older car parked behind
the victim's pickup. Appellant also cites us to testimony establishing that a person received a
telephone call from the victim after she disappeared. Robert Cook, appellant's business partner,
testified that he received a call from someone on June 26, 1992, who identified herself as Tracy
Parsons.

 The State is dependent upon circumstantial evidence in discharging its burden to
prove appellant guilty of murder. While none of the following circumstances, standing alone,
meet the State's burden of proof, we find the cumulative effect of all the incriminating evidence
sufficient to sustain the jury's finding of guilt under the Jackson standard. It is elementary that
the jury in weighing the evidence, may believe or reject any or all of any witness's testimony. 
Viewing the evidence in the light most favorable to the jury's verdict, we find a number of
incriminating circumstances that furnish the underpinning of its verdict.

 There is evidence of appellant raping and trying to choke the victim, which resulted
in her leaving him. Appellant displayed a violent temper when he was served with the protective
order issued at the victim's request. Appellant was unable to establish an alibi of his whereabouts
at the time of the victim's disappearance that could withstand impeachment. The victim's
fingerprints were found on the inside of the passenger's window of appellant's vehicle, an auto
that appellant had acquired after the victim left him. Scratches and cuts were observed on
appellant's legs shortly after the victim disappeared, and the jury could have reasonably inferred
that they resulted from contact with briar bushes in the field where the victim's remains were
found. Appellant failed to appear at his shop or keep an appointment following the victim's
disappearance. Appellant showed no emotion or interest when he was advised that the victim's
remains had been found despite evidence that he threatened to commit suicide if the victim did not
meet with him a day or two before she disappeared. Appellant failed to respond when asked to
help in identification of her remains. Appellant telephoned his daughter on November 30, 1992
advising her that he was on the run from the police; that they had found his ex-girlfriend's body. 
Appellant fled to Montana and used an alias when he heard a warrant was issuing for his arrest. 
See Foster v. State, 799 S.W.2d 845, 859 (Tex. Crim. App. 1989). The victim feared appellant
who was very jealous and possessive of her. Appellant's business had a good view of the
deceased's parking place at Sam's. The jury could have reasonably inferred that appellant knew
how to choke a person from an ex-girlfriend's testimony about his demonstration on her. Viewing
the evidence in the light most favorable to the verdict, we find that any rational trier of fact could
have found the essential elements of the offense beyond a reasonable doubt. Appellant's first
point of error is overruled.

 In his second point of error, appellant urges that the evidence is not factually
sufficient to support the conviction under this Court's standard for factual review in Stone v. State,
823 S.W.2d 375 (Tex. App.--Austin 1992, pet. ref'd, untimely filed). See Clewis v. State, No.
450-94, slip op. at 2 (Tex. Crim. App. Jan. 31, 1996) (adopting Stone test). In Stone, this Court
set forth the following standard for a factual review of the evidence:



[T]he court views all the evidence without the prism of `in the light most favorable
to the prosecution.' Because the court is not bound to view the evidence in the
light most favorable to the prosecution, it may consider the testimony of defense
witnesses and the existence of alternative hypotheses. The court should set aside
the verdict only if it is so contrary to the overwhelming weight of the evidence as
to be clearly wrong and unjust.



Stone, 823 S.W.2d at 381 (citations omitted).

 After viewing all of the evidence, including the testimony of defense witnesses and
the existence of alternative hypothesis, we conclude that the jury's verdict is not so contrary to
the overwhelming weight of the evidence as to be clearly wrong and unjust. Appellant's second
point of error is overruled.

 In his third point of error, appellant contends the trial court erred in admitting into
evidence the temporary ex-parte protective order and the show-cause order. The trial court
admitted into evidence, over appellant's objections, two instruments showing that the victim had
made an application for an ex-parte protective order and a show-cause order. The protective order
prohibited appellant from: committing acts of family violence; communicating in a threatening
or harassing manner with a member of the victim's family or household; and going within 200
yards of the victim or of Sam's Club at 1601 North Lamar. The order stated it became effective
immediately, was to remain in force until June 25, 1992, and ordered appellant to appear before
the trial court on June 25, 1992 to show cause why the ex-parte protective order should not be
made into a final order. The order was signed by the judge of County Court at Law No. 2 of
Travis County. The officer's return reflects that that service was had on appellant on June 12,
1992. All acts of violence alleged to have been committed on the victim such as raping, choking,
striking the victim with his fist, getting his shotgun and slashing the victim's tires were redacted
from the instruments. The trial court instructed the jury that the instruments were not admitted
as proof that any act of violence occurred. Prior to the foregoing instruction, the trial court asked
defense counsel if this was the instruction they wanted and defense counsel responded with an
affirmative answer.

 Appellant urges that the instruments were hearsay, and in the alternative, that they
were unduly prejudicial and probably contributed to appellant's conviction. Appellant contends
that, in spite of the trial court's instruction, the effect of the instruments was to show that
appellant committed acts of violence toward the deceased and that the court considered this in
concluding that the victim needed protection.

 The general rule is that pleadings and judgments from other cases constitute
inadmissible hearsay. See Sharpe v. State, 648 S.W.2d 705, 706 (Tex. Crim. App. 1983). The
State urges that the order was relevant to show the context of the offense and motive. In McClure
v. State, 575 S.W.2d 564 (Tex. Crim. App. 1979), the court held that evidence of the wife's
infidelity was admissible to show the defendant's state of mind. Id. at 566.

 Evidence in a prosecution for murder is specifically addressed in the Texas Code
of Criminal Procedure, which provides in pertinent part:



In all prosecutions for murder, the state or the defendant shall be permitted to offer
testimony as to all relevant facts and circumstances surrounding the killing and the
previous relationship existing between the accused and the deceased, together with
all relevant facts and circumstances going to show the condition of the mind of the
accused at the time of the offense.



Tex. Code Crim. Poc. Ann. art. 38.36(a) (West Supp. 1996).

 The testimony of Constable Curry shows that appellant reacted with "intense anger
. . . like a pot fixing to boil" when the papers were served on him. Appellant told a friend about
the protective order and said that he would like to talk to the deceased and "find out why in the
hell she's doing this to me?". Apart from any inferences the jury may have drawn from the
protective order, the record contains repeated references to appellant's acts of violence toward the
victim. Appellant's ex-wife testified that appellant told her he had forced sex on the victim. 
Testimony was before the jury about how the victim had told of appellant choking her and raping
her as well as of her fear of appellant. Kleinert testified that appellant demonstrated on her how
he was supposed to have choked the victim and that she had to push him off. Moreover, there
was testimony before the jury that appellant had talked about the protective order and discussed
what he should do about it. We find that the protective order with its reference to violent acts
redacted constituted a relevant fact and circumstance tending to show the condition of appellant's
state of mind at the time of the offense and was a relevant fact surrounding the killing and the
relationship existing between appellant and the deceased. Given all the other evidence of violence,
if the admission of the redacted order was error, we find beyond a reasonable doubt that it made
no contribution to the conviction or the punishment. See Tex. R. App. P. (81)(b)(2). Appellant's
third point of error is overruled.

 In his fourth point of error, appellant contends that the trial court erred in failing
to grant a mistrial based on the prosecutor's argument attacking defense counsel at the guilt-innocence stage of the trial. After reviewing what he characterized as misrepresentations of the
evidence in defense counsel's argument, the prosecutor argued:



 How many misrepresentations are you going to put up with before you get
hacked off, before you say, "Wait a minute, man. You're worse than the dadgum
Defendant. You lie and lie and lie"?



 The trial court sustained appellant's objection, instructed the jury to disregard the
argument and admonished the prosecutor to "refrain from comments about defense counsel." 
Appellant's motion for mistrial was urged after the conclusion of the prosecutor's argument.

 The State urges that the motion for mistrial came too late to preserve error. See
Williams v. State, 427 S.W.2d 868, 873 (Tex. Crim. App. 1976). However, an exception to the
rule of waiver exists if a motion is not timely made when an instruction to disregard could not
have cured the harm. See Wilkerson v. State, 321 S.W.2d 321, 328 (Tex. Crim. App. 1994).

 Appellant cites Fuentes v. State, 664 S.W.2d 333 (Tex. Crim. App. 1984), in
support of his contention that the instruction to disregard was insufficient to cure the error. 
Specifically, appellant points to the prosecutor's statement in Fuentes that counsel was "in bad
faith like usual and we object to it. That is a bunch of garbage and he knows it." Id. at 335.

 In a recent case, the Court of Criminal Appeals held that the prosecutor's errors
in accusing defense counsel of being unethical and a liar at the guilt-innocence stage, and in
accusing defense counsel of extortion at the punishment stage, were cured by the trial court's
instructions to disregard. Norris v. State, 902 S.W.2d 428, 445 (Tex. Crim. App. 1995). The
Norris court found Fuentes distinguishable because there were objectionable comments by the
prosecutor throughout the Fuentes trial that tainted the entire proceeding. Id. at 443.

 In the instant cause, appellant points to other instances in which the prosecutor
argued that defense counsel misrepresented the evidence and referred to appellant as a liar. In
light of the impeachment of appellant's alibi testimony, the references to appellant being a liar
were reasonable inferences from the evidence. Defense counsel argued at the guilt innocence
stage that the "State wants you to believe the big lie . . . we can have a country based on hatred,
fear, and sarcasm, or we can have a country based on justice. Justice demands that you find
appellant not guilty . . . the State did not want to talk about the facts, they want to try the case
with mirror, smoke, and illusion."

 While a portion of the prosecutor's argument was invited, the assertion that
"You're worse than the dadgum defendant . . . You lie and lie and lie" extended beyond the scope
of the invitation. We are unable to condone this type of attack on counsel and believe it reflects
badly on the prosecutor. The question we must resolve is whether the prosecutor's remarks were
so prejudicial as to constitute reversible error. "[O]nly offensive or flagrant error calls for
reversal when there has been an instruction to disregard." Cooks v. State, 844 S.W.2d 697, 728
(Tex. Crim. App. 1992). In the instant cause, the trial court gave a prompt instruction to
disregard. The trial court's instruction was given greater emphasis by the trial court's admonition
to the prosecutor in the presence of the jury to refrain from comments about defense counsel. The
trial was hard fought and lasted over three weeks. The statement of facts consume twenty-three
volumes. While the prosecutor's remarks cannot be condoned, we do not find them to be any
more egregious in the context of this cause than the prosecutor's remarks in Norris that were held
to be cured by the trial court's instruction to disregard. Appellant's fourth point of error is
overruled.

 In his fifth point of error, appellant asserts that the trial court erred in overruling
his objection that the prosecutor's argument constituted an improper plea for law enforcement. 
At the guilt-innocence stage of the trial, the prosecutor argued:



 The most important person is Sheryl Parsons sitting two to the right by
another real important person, Sheriff Boutwell. Sheryl Parsons, the mother of
Tracy Parsons, the person that got robbed, the person that Don Wilson robbed of
her daughter on June 18, 1992.


 Sheriff Boutwell is here, a person that has given the best years of his life
to make sure that people still want to come to Williamson County when other
counties around us are deteriorating and going down like dominoes, making sure
that there is still a good sound basis where you can actually not even worry too
much about -- Well, maybe its just my "old '74 car" that you can not worry about
locking it up. I don't have to worry about that here.


 He came. Lots of law enforcement that you saw in the trial, here in the
audience. They'll remember too, quite frankly.



 In Cortez v. State, 683 S.W.2d 419 (Tex. Crim. App. 1984), cited by appellant,
the prosecutor argued, "[T]he only punishment that you can assess that would be any satisfaction
to the people of this county would be life [imprisonment]." Id. at 420. The trial court overruled
defendant's objection to the argument. The Court of Criminal Appeals held that an argument
designed to induce the jury to convict or assess a particular punishment because the people desire
such is improper jury argument. Id. In Prado v. State, 626 S.W.2d 775 (Tex. Crim. App. 1982),
the trial court overruled defendant's objection to the prosecutor's argument that there were over
a million people that would want the defendant to go to the penitentiary. Id. at 776. The court
held that the prosecutor's argument was improper because he spoke to the community's desire for
punishment of confinement rather than probation. Id. at 777.

 In Harris v. State, 784 S.W.2d 5 (Tex. Crim. App. 1989), the prosecutor argued
that there was one verdict that's proper, "You've known it since yesterday, the verdict that family
and those police and the people of Jefferson county know is proper in this case." Id. at 11. The
court found the argument to be analogous to saying "after hearing all the evidence, I know, you
know, and everyone in this courtroom knows the defendant is guilty." Id.at 13. The court further
noted that the prosecutor did not tell the jury to convict the defendant because the verdict was
expected of them. Id. In Goff v. State, 794 S.W.2d 126 (Tex. App.--Austin 1990, pet. ref'd), the
prosecutor argued, "If you want to find somebody like this innocent . . . , you may do it, but you
will have to explain your actions to the community." This Court held that the argument did not
require reversal. Id., at 127-28. The court found that the argument did not necessarily contain
an implication that the jury should disregard the evidence and convict because the community
desires it. Id. at 128. See Bell v. State, 774 S.W.2d 371, 375 (Tex. App.--Austin 1984, pet.
ref'd).

 The prosecutor's argument in the instant cause did not necessarily imply that the
jury should convict because the community or Sheriff Boutwell desired it. Appellant's fifth point
of error is overruled.

 In his sixth point of error, appellant urges that the trial court erred in failing to
grant a mistrial because the prosecutor's argument constituted a comment on appellant's failure
to testify. At the punishment stage of the trial, the prosecutor argued:



 The second purpose that punishment is to serve, we're instructed by our
legislature, is the rehabilitation of those convicted, if possible. What is the first
step in rehabilitation? It is acceptance of responsibility. It is repentance. Have
you heard any evidence that this Defendant has accepted his responsibility?



 The trial court sustained appellant's objection, instructed the jury to disregard the
argument, but overruled appellant's motion for a mistrial. The prosecutor then stated that he was
referring to appellant's testimony during the guilt-innocence stage, to a lack of testimony from the
people who knew him, and to the manner in which appellant acted following the victim's death. 
Appellant suggests that these remarks served to increase the prejudicial effect of the prior
argument.

 "The presumption that an instruction [to disregard] generally will not cure comment
on failure of the accused to testify . . . has been eroded to the point that it applies only to the most
blatant examples. Otherwise, the Court has tended to find the instruction to have force." Waldo
v. State, 746 S.W.2d 750, 753 (Tex. Crim. App. 1988) (emphasis omitted). The argument of the
prosecutor in the instant cause cannot be characterized as a blatant example of commenting on the
appellant's failure to testify at the punishment phase of the trial. We hold that the trial court's
instruction cured any error in the prosecutor's argument. Appellant's sixth point of error is
overruled.

 In his seventh point of error, appellant contends that the trial court erred in
overruling his motion for mistrial when the prosecutor asked the jury to apply the parole law to
appellant. After defense counsel argued that "there had been one tragedy, and we don't need to
make another tragedy," the prosecutor argued:



We are in agreement on one thing, and that is that we don't want another tragedy
to occur. We just have a difference of opinion as to what they think a tragedy
would be and what we think a tragedy would be. For them it would be locking
Don Wilson up for a long time. And when I say "long," that's even a term that
we would probably have a difference of opinion on because you know even if you
lock--even if you assess him a life sentence that he will be eligible for parole-- Even
if you assess a life sentence, even if you-- Even if you have an affirmative finding
of a deadly weapon, he will be eligible for parole-- Even if he does nothing but
wave his nose at the prison officials, he will be eligible for parole in 15 years.



The trial court sustained appellant's objection, instructed the jury to disregard, but overruled
appellant's motion for mistrial.

 The jury charge contained an instruction on the parole law. See Tex. Code Crim.
Proc. Ann. art. 37.07 (West Supp. 1996). Pursuant to the provision of article 37.07, the charge
included instructions: that if the jury found that a deadly weapon was used in the commission of
the offense, appellant would not become eligible for parole until the actual time served equalled
one-fourth of the sentence imposed or 15 years, whichever is less, without any consideration of
any good conduct time he may earn; and that the application of parole to any specific case cannot
be predicted with certainty.

 Appellant cites Brown v. State, 769 S.W.2d 565 (Tex. Crim. App. 1989), for the
proposition that the State's argument calling for the jury to consider and apply the parole law was
improper. Id. at 567. However, the Brown court held that the trial court's instruction to
disregard was sufficient to cure the error. Id. We find that the argument in the instant cause was
no more harmful than the prosecutor's argument in Brown telling the jury its sentence could be
a fiction under the law of parole. We hold that the trial court's instruction to disregard in the
instant cause was sufficient to cure any error in the prosecutor's argument. Appellant's seventh
point of error is overruled.

 In his eighth point of error, appellant contends that the trial court erred in admitting
character evidence. Julia Hirsh, a witness on behalf of the State, testified that appellant had been
her boss when she worked at North Central Dodge in Austin. Hirsh lived in Hutto, the place
where the victim's remains were found. Hirsh stated she and her husband invited appellant to
their home for Thanksgiving one year when she worked with him. Hirsh drew appellant a map
on how to reach their house because it was difficult to find. It appears the reason for the
introduction of Hirsh's testimony was to show that appellant knew how to reach Hutto.

 Under cross-examination by defense counsel, Hirsh was asked, "You don't like
Don Wilson [appellant], do you?" Hirsh answered, "Not particularly, no." On redirect, Hirsh
was allowed to explain, over appellant's objection, why she didn't like appellant. Hirsh testified
that she didn't like the way he dealt with employees and irate customers; "he had a very short
fuse," and he would "just get right back in their face."

 Appellant urges that Hirsh's testimony was inadmissible as "[e]vidence of other
crimes, wrongs, or acts . . . to prove the character of a person to show that he acted in conformity
therewith." Tex. R. Crim. Evid. 404(b). In Gass v. State, 785 S.W.2d 834 (Tex.
App.--Beaumont 1990, no pet.), a witness for the State admitted under cross-examination that he
had made a statement that he would do anything to see the defendant in prison, but denied that he
would commit perjury. Id. at 838. On redirect, the witness was allowed to testify that the basis
of his testimony was that he had been sexually abused as a child when he lived in the home of the
defendant. The court overruled the defendant's claimed error of remote extraneous offenses,
holding that the defendant had opened the door to this testimony. Id. In Gass, the defendant's
convictions were for the offenses of indecency with a child and aggravated sexual assault. It
would appear that the redirect testimony of the witness in Gass was far more damaging than that
of the witness in the instant cause. We hold beyond a reasonable doubt that error, if any, in the
complained-of redirect testimony was harmless and made no contribution to the conviction or to
the punishment. Appellant's eighth point of error is overruled.

 In his ninth point of error, appellant contends that the trial court erred in admitting
evidence of appellant's sexual activity over his objection of lack of relevance. West testified that
her relationship with appellant began in November 1992 before the victim's remains were found. 
West told of her close relationship with appellant, about how she spent nights with him, and of
how appellant advised her that he was using the name of West when he left for Montana because
it would be better for her children. When appellant went to Houston to visit his friends, Shelia
and Albert, appellant admitted to her that he had been intimate with Shelia. Over appellant's
objection, West was allowed to testify that they both liked sex, that they had sex morning and
night, and that appellant asked her if she ever had an excuse. The jury could have reasonably
inferred from West's earlier, unobjected to testimony about spending nights with appellant that
they were in a sexual relationship.

 We find the probative value, if any, of the complained evidence is not substantially
outweighed by any of the considerations that might necessitate its exclusion. See Tex. R. Crim.
Evid. 403. Assuming its admission was error, we hold beyond a reasonable doubt that the error
made no contribution to the conviction or the punishment. See Tex. R. App. P. 81(b)(2). 
Appellant's ninth point of error is overruled.

 In his tenth point of error, appellant contends that the trial court erred in admitting
evidence of other alleged crimes, wrongs or bad acts. Specifically, appellant asserts that the trial
court erred in overruling his objections to the admission of evidence of: (1) fights between
appellant and the victim; (2) the temporary protective order and references thereto; and (3)
insufficient checks and flight from the jurisdiction. Appellant urges that each of the acts was
offered to prove character to show that he acted in conformity therewith. See Tex. R. Crim.
Evid. 404(b). If admissible, appellant contends that the probative value of the evidence was
outweighed by its prejudicial effect upon the jury. See Tex. R. Crim. Evid. 403.

 "`Relevant evidence' means evidence having any tendency to make the existence
of any fact that is of consequence to the determination of the action more probable or less
probable than it would be without the evidence." Tex. R. Crim. Evid. 401. Appellant made a
written statement to the police in which he described a fight with the victim. Appellant objected
to the admission of the following portion of the statement: "I pulled over to the side of the road
and pulled the key out of the ignition and threw it at her and told her to got he [sic] f _ _ _ 
home." We find that the complained of evidence was relevant to show the "previous relationship
existing between the accused and the deceased." Tex. Code Crim. Proc. Ann. art. 38.36(a) (West
Supp. 1996). Our disposition of appellant's point of error three is dispositive of his complaint
about the admission of the redacted protective order.

 Appellant told West that he was going to finance his trip to Montana with money
that he got from checks at the back of the business checkbook. Robert Cook testified that he was
appellant's business partner. Cook had put up the money for appellant to open the shop. The two
of them usually consulted on every check that was written. After appellant stopped showing up
for work, Cook noticed that checks on the business account had been written out of order. The
checks, dated January 20 through January 22, 1993 totalled $2,184. Cook stated that appellant
was not entitled to this amount of money and that appellant's withdrawals resulted in other checks
written for operation of the business being returned by the bank for insufficient funds. Flight to
avoid arrest is generally held to be admissible on the issue of guilt. Hunter v. State, 530 S.W.2d
573, 575 (Tex. Crim. App. 1975). The circumstances incidental to flight are admissible in
evidence "even though they may also show extraneous offenses." Id.

 An appellate court should not reverse a trial court's ruling on the admission of
evidence of other "crimes, wrongs, or acts" under rule 403 when its ruling was "within the zone
of reasonable disagreement." Montgomery v. State, 810 S.W.2d 372, 391 (Tex. Crim. App.
1990). We find each of the alleged instances of admission of extraneous evidence was within the
zone of reasonable disagreement. Appellant's tenth point of error is overruled.

 In his eleventh point of error, appellant contends that the trial court erred in
admitting hearsay evidence over his objection. Kleinert, with whom the victim was staying after
she left appellant, testified that the victim called appellant in the early afternoon of June 16 or
June 17 before the victim disappeared on June 18. It appears that the victim was trying to get her
renewed driver's license that had been mailed to appellant's address. The victim went into the
back bedroom to make the call, and when she returned about ten minutes later, Kleinert stated that
the victim was crying, her face was real red, and she "seemed to be kind of shaking." She was
excited or under some kind of emotion. The trial court permitted Kleinert to testify, over
appellant's hearsay objection, that appellant wanted to meet with her, she told him no, and
appellant said "he was going to commit suicide if she didn't meet with him . . . it really upset
her."

 "A statement relating to a startling event or condition made while the declarant was
under the stress of excitement caused by the event or condition" is admissible as an exception to
the hearsay rule. Tex. R. Crim. Evid. 803(2). The critical factor in determining whether an
excited utterance comes within the exception is "whether the declarant was still dominated by the
emotions, excitement, fear or pain of the event." Ross v. State, 879 S.W.2d 248, 249 (Tex.
App.--Houston [14th Dist.] 1994, pet. ref'd). The fact that the victim's statement may have been
in response to a question from Kleinert does not make it inadmissible under the excited utterance
exception. See id. We hold that the victim's statement to Kleinert was admissible under the
excited utterance exception. Appellant's eleventh point of error is overruled.

 The judgment of the trial court is affirmed.



 

 Tom G. Davis, Justice

Before Chief Justice Carroll, Justices Kidd and Davis*

Affirmed.

Filed: April 17, 1996

Do Not Publish










* Before Tom G. Davis, Judge (retired), Court of Criminal Appeals, sitting by assignment. See
Tex. Gov't Code Ann. § 74.003(b) (West 1988).



ve of his complaint
about the admission of the redacted protective order.

 Appellant told West that he was going to finance his trip to Montana with money
that he got from checks at the back of the business checkbook. Robert Cook testified that he was
appellant's business partner. Cook had put up the money for appellant to open the shop. The two
of them usually consulted on every check that was written. After appellant stopped showing up
for work, Cook noticed that checks on the business account had been written out of order. The
checks, dated January 20 through January 22, 1993 totalled $2,184. Cook stated that appellant
was not entitled to this amount of money and that appellant's withdrawals resulted in other checks
written for operation of the business being returned by the bank for insufficient funds. Flight to
avoid arrest is generally held to be admissible on the issue of guilt.